2012 COA 117

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Jeff Anthony CASIAS, Defendant–Appellant.**

**No. 09CA1745.**

Colorado Court of Appeals, Div. I.

July 19, 2012.

Rehearing Denied Sept. 27, 2012.*

---

* Fox, J., would grant.

John W. Suthers, Attorney General, Alice Q. Hosley, Assistant Attorney General, William Kozeliski, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Joseph Paul Hough, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge DAILEY.

¶ 1 Defendant, Jeff Anthony Casias, appeals the judgments of conviction entered on jury verdicts finding him guilty of first degree murder (causing the death of a child under the age of twelve by one in a position of trust) and knowing or reckless child abuse resulting in death. We affirm.

## I. Background

¶ 2 Defendant's girlfriend left defendant at home with their seven-week-old baby, J.C. When she left, defendant was holding an awake, responsive, and content J.C. Shortly afterwards, however, defendant telephoned to tell her that J.C. had choked and stopped breathing. Defendant hung up but called back moments later to tell her that he was taking J.C. to the hospital.

¶ 3 Upon arrival at the hospital, J.C. was unresponsive and limp and did not open her eyes or move any of her extremities. Defendant told the emergency room physician that he had been feeding her when she began choking and that, in an effort to help her, he put cold water on her and shook her "a little bit but not excessively."

¶ 4 J.C. died the next morning.

¶ 5 At trial, the People presented expert witnesses who opined that J.C. died as the result of nonaccidental traumatic brain injury caused by being violently shaken or "slamm[ed]" against a hard surface. The experts based their opinions on fractures to J.C.'s skull and rib, hemorrhages in both her retinas, severe swelling of her brain, and bruising on her forehead.[1] According to some experts, J.C.'s injuries had been recently inflicted, that is, within a day or two of her death. Additionally, some stated that J.C.'s injuries would have immediately affected her heart rate and breathing, making her lethargic and unable to focus.

¶ 6 Defendant asserted that J.C.'s injuries were the result of a fall off the bed onto a hardwood floor approximately a week before she died. Consistent with this theory, defendant's girlfriend testified that seven to ten days before she died, J.C. rolled off the bed, struck her head on the wooden floor, and thereafter was more lethargic, had trouble eating, was congested, and "cried a lot."

¶ 7 Also consistent with this theory, defendant's expert witness testified that (1) skull fractures in children J.C.'s age could result from short falls onto a hard surface; (2) she

did not see injuries to the upper neck, spinal cord, and brain stem that she would expect if J.C. had been injured as a result of being shaken; and (3) choking is reported in many cases where a child has the type of brain damage J.C. suffered. Defendant's expert also opined, contrary to the People's evidence, that J.C.'s rib injuries could have resulted from either a deformity or CPR performed on her, and that retinal hemorrhages are found in accidental deaths and are not characteristic of significant force to the head.

¶ 8 For the purposes of showing defendant's knowledge or absence of mistake, the prosecution was permitted to introduce evidence of two instances in which defendant allegedly abused his three-year-old daughter, A.C.

¶ 9 The jury convicted defendant as charged, and the trial court sentenced him to concurrent terms of life imprisonment without the possibility of parole on the first degree murder count and twenty-four years imprisonment on the child abuse count.

## II. Refusal to Allow Expert Testimony via Video–Conferencing Equipment

¶ 10 Defendant contends that the trial court erred when it precluded a defense expert from testifying live via video-conferencing equipment. We disagree.

¶ 11 Twenty-two days before trial, defendant endorsed, as an expert witness, a radiologist who, after reviewing J.C.'s medical file, concluded that her head injuries could not be distinguished as accidental or nonaccidental and that her rib injuries were likely caused by a bone disorder. Defendant simultaneously filed a motion to permit the expert to testify via telephone because he was unable to travel to Colorado on the dates scheduled for trial. Over the prosecution's objection to the late endorsement of the witness,[2] the trial court determined that the expert would be allowed to testify. However, the court ruled that the expert would have to testify in person because allowing him to testify tele-

---

1. The jury also heard evidence that J.C. had a bruise on her right hand that one expert thought resulted from defendant's hitting her with a hairbrush that was found in the home.

2. Defendant should have endorsed this witness no later than thirty days before trial. *See* Crim. P. 16(V)(b)(1).

phonically would limit the prosecution's ability to cross-examine him.

¶ 12 Defendant then filed a motion to permit the expert to testify via video-conferencing. In his motion, defendant asserted that video testimony "would alleviate the Court's concern regarding fairness to the prosecution in cross-examination [and] ... allow[ ] for the jurors to judge [the expert's] demeanor on the stand." Defendant subsequently confirmed that the courtroom had the necessary equipment to conduct video-conferencing, and that the equipment had been tested and worked properly. The prosecutor renewed her objection to the late endorsement of the expert and objected to allowing him to testify by video because (1) she could not control what documents the expert had access to, and thus, she could not adequately or effectively cross-examine him, and (2) the technology had not yet been used in the courtroom, and thus, the quality of the audio and video was unknown.

¶ 13 The trial court denied defendant's motion because (1) it did not have confidence that the video-conferencing equipment would work and (2) as neither the prosecution nor the jury would be able "to see how the [expert] ... reacts," allowing video testimony would affect the prosecution's ability to cross-examine the witness and the jury's ability to assess the witness's credibility.

¶ 14 The day before trial, defendant filed a motion to reconsider the court's video-conferencing ruling or, in the alternative, to continue the trial until a date upon which the expert could appear in person to testify. In his motion, defendant asserted that the expert witness was essential to his defense. The court denied both proposed alternatives.

¶ 15 On appeal, defendant asserts that the court's refusal to allow his expert to testify via video-conferencing equipment violated his constitutional rights to present a defense and to a fair trial. He characterizes the court's action as an exclusion of his expert's testimony for a discovery violation, which, he asserts, cannot be justified under the five-factor test of *People v. Pronovost*, 773 P.2d 555, 558 (Colo.1989).

¶ 16 Defendant's argument is built upon a false premise. The court did not exclude his expert from testifying. Indeed, the court expressly permitted his expert to testify, despite having been belatedly endorsed. The court simply required that the expert testify in court. As such, the court's ruling calls into question only the exercise of its discretion in reasonably controlling the interrogation of witnesses and the presentation of evidence. *See* CRE 611(a).

¶ 17 A trial court abuses its discretion when its ruling is (1) manifestly arbitrary, unreasonable, or unfair or (2) based on an erroneous understanding or application of the law. *People v. Muniz*, 190 P.3d 774, 781 (Colo.App.2008).

¶ 18 "[T]here is nothing arbitrary about favoring [in-court] over remote testimony...." *Djedovic v. Gonzales*, 441 F.3d 547, 551 (7th Cir.2006) (upholding denial of motion to permit telephonic testimony from expert). For centuries, courts have observed the traditional requirement that witnesses deliver testimony in person and in open court:

> The rule is a function of the adversarial mode of Anglo–American adjudication that encourages litigants, in the elusive search for the truth, to subject opposing witnesses to rigorous cross-examination. The rule [also] promotes another core feature of our adjudicatory system: the factfinder's all-important function of observing the demeanor and evaluating the credibility of each witness that comes before the court.

*State v. Santos*, 210 N.J. 129, 42 A.3d 141, 147 (2012) (citations omitted) (discussing motion to have defendant testify from Mexico via telephone).

¶ 19 To this effect, Crim. P. 26 provides that "[i]n all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by law." The rule protects not only a defendant's confrontation rights but also the fundamental fairness of the trial itself. *See United States v. Banki*, 2010 WL 1063453 (S.D.N.Y. No. 10 CR. 08(JFK), Mar. 23, 2010) (unpublished opinion and order) (denying, under the nearly identically worded Fed.R.Civ.P. 26, the defendant's

request for videoconference testimony because, although government's interest in confrontation was not of constitutional proportion, such testimony lacked safeguards which "bear on the integrity of the overall proceedings"); *United States v. Hernandez*, 2005 WL 1244918 (E.D.Pa. No. CRIM.05–047, May 24, 2005) (unpublished memorandum and order) (denying the defendants' request for telephone testimony because such testimony introduces "fundamental concerns," such as "impermissibly shortchang[ing] the jury, the witness, and the judicial process itself").

¶ 20 Courts have recognized certain disadvantages of video testimony. *See, e.g., United States v. Lawrence*, 248 F.3d 300, 304 (4th Cir.2001) ("[V]irtual reality is rarely a substitute for actual presence and ... even in an age of advancing technology, watching an event on the screen remains less than the complete equivalent of actually attending it."); *Edwards v. Logan*, 38 F.Supp.2d 463, 467 (W.D.Va.1999) ("[Video-conferencing] is not the same as actual presence, and it is to be expected that the ability to observe demeanor, central to the fact-finding process, may be lessened in a particular case by video[-]conferencing.").

¶ 21 Defendant has not cited any authority, and we have found none, for the proposition that he was *entitled* to present the testimony of his expert through video-conferencing.

Indeed, the concerns with video-conferencing mentioned in the cases cited above are particularly relevant in a case such as this, where the majority of the evidence presented was highly complicated medical testimony. *Cf. Edwards*, 38 F.Supp.2d at 467 (where the issue in dispute was simple and straightforward, the court did not anticipate difficulty in the effective presentation of all of the facts and contentions through video-conferencing). We conclude that the trial court did not abuse its discretion in requiring defendant to present his expert testimony in court.[3]

¶ 22 We emphasize that our decision here is grounded in an application of the abuse of discretion standard of review, and not in a categorical bar on the receipt of live testimony via video-conferencing equipment. The receipt of live testimony through that mechanism is, after all, authorized, in limited circumstances, by statute.[4] And we can envision other situations where receipt of video-conferencing testimony would be appropriate: for example, when a witness is unable to appear for trial because of a last minute exigency wholly beyond the control of the defendant or the witness, and it would not present any unusual logistical difficulties.

### III. Admission of Other Bad Acts Evidence

¶ 23 Defendant contends that the trial court erroneously admitted evidence that he

**3.** To the extent that defendant asserts that the trial court should have allowed his expert to testify via video deposition or continued the trial, we note that he presents these options, not as separate arguments, but as part of his contention that the court had alternatives available other than excluding his expert from testifying. However, as we noted, the court did not exclude his expert from testifying; it simply required the expert to present his testimony in court. In any event, denial of these requests was not an abuse of discretion, inasmuch as (1) defendant moved for a video deposition eleven days before trial, and the continuance, only the day before trial; (2) the case had been pending for over two and a half years; (3) the court had already granted defendant two continuances; (4) trial had been set for five months; and (5) the expert was known to the defense at least two (and perhaps seven) months prior to the scheduled trial date. *See, e.g., Cherry Creek Sch. Dist. No. 5 v. Voelker*, 859 P.2d 805, 810 (Colo.1993) (upholding denial of motion to take video deposition made thirty days before trial); *People in Interest of J.T.*, 13

P.3d 321, 322 (Colo.App.2000) (upholding denial of motion to continue where, inter alia, it was made on day before trial, case had been pending for six months, and case had previously been continued twice); *People v. Scarlett*, 985 P.2d 36, 41–42 (Colo.App.1998) (upholding denial of motion to continue where the defendant was aware that expert was a possible witness more than two months before trial); *People v. Thomas*, 962 P.2d 263, 267 (Colo.App.1997) (upholding denial of request for continuance where, inter alia, case had been pending for more than two years and one continuance had already been granted).

**4.** A closed-circuit television procedure may be used to obtain the live testimony of a child who "at the time of a trial is ... less than twelve years of age" when "[t]he judge determines that testimony by the witness in the courtroom and in the presence of the defendant would result in the witness suffering serious emotional distress or trauma such that the witness would not be able to reasonably communicate." § 16–10–402(1)(a), C.R.S.2011.

had, on two prior occasions, mistreated his other daughter, A.C. We agree for two reasons. First, the prosecution offered evidence of defendant's alleged past acts only to prove his mental state, but those acts did not result in serious injury or death to A.C. Second, those acts bear no resemblance to the acts he was alleged to have committed against J.C.

¶ 24 The prosecution sought to introduce evidence of numerous other bad acts committed by defendant involving alleged abuse of A.C. and domestic violence against his girlfriend. After conducting an evidentiary hearing, and considering the parties' written submissions, the court denied the prosecution's request with respect to all but two of the alleged acts.

¶ 25 Both of the alleged acts for which the prosecution was permitted to introduce evidence concerned defendant's treatment of A.C.: approximately four to five months before J.C.'s death, defendant had slapped A.C. hard enough to leave a handprint (and later a bruise) on her face, and, on another occasion, he had taken her by the arm, shaken her "a little bit," thrown her into a car, and "smacked" her on the arm. On both occasions, the acts against A.C. occurred shortly after an argument between defendant and another adult (in the first instance, with his girlfriend's sister, and in the second instance, with the girlfriend).

¶ 26 In a written order, the trial court found that evidence concerning the two acts was admissible because it was relevant, apart from any inference of bad character, to show that defendant had acted knowingly and recklessly—rather than mistakenly—toward the victim in this case. During trial, the court instructed the jury that the evidence could "be used for the purpose of showing knowledge or absence of mistake and . . . for no other purpose."

¶ 27 The admission of evidence of other bad acts may "unfairly expose[ ] a defendant to the risk of being found guilty based on bad character rather than on evidence relating to the charged offense." *People v. Lopez*, 129 P.3d 1061, 1064 (Colo.App.2005). Thus, evidence of other bad acts is inadmissible if its relevance depends only on an inference that the person has a bad character and acted in conformity therewith. CRE 404(b); *People v. Cooper*, 104 P.3d 307, 309 (Colo. App.2004).

¶ 28 Under CRE 401, 403, and 404(b), however, a trial court may admit evidence of a defendant's other bad acts if (1) the evidence is offered for a proper purpose; (2) the evidence is logically relevant to a material issue in the case; (3) its relevance is independent of the intermediate inference that the defendant has a bad character;[5] and (4) its probative value is not substantially outweighed by the danger of unfair prejudice. *People v. Rath*, 44 P.3d 1033, 1038 (Colo. 2002).

¶ 29 Trial courts have considerable discretion to decide questions concerning the admissibility of evidence, *id.*, and an abuse of discretion will only be found upon a showing that the court misconstrued or misapplied the law or otherwise reached a manifestly arbitrary, unreasonable, or unfair result. *See generally People v. Garcia*, 169 P.3d 223, 226 (Colo.App.2007).

¶ 30 Here, the court found that the conditions for admitting evidence of the two instances of alleged abuse against A.C. were satisfied. As pertinent to our inquiry, the court found that the evidence was logically relevant to a material issue in the case, independent of any inference of bad character:

> Evidence indicating that the Defendant had engaged in abusive behavior toward another small child in the near past has some tendency to make it more probable

---

5. "[E]vidence of other acts often suggests bad character and action in conformity therewith. However, '[this] third prong . . . does not demand the absence of the inference but merely requires that the proffered evidence be logically relevant independent of that inference.'" *Masters v. People*, 58 P.3d 979, 998 n. 4 (Colo.2002) (quoting *People v. Snyder*, 874 P.2d 1076, 1080 (Colo.1994)); *see also People v. Everett*, 250 P.3d 649, 657 (Colo.App.2010) ("[A]lmost any evidence of other crimes will suggest that the defendant has a bad character and acted consistently with that character. The key to understanding the third . . . step is that it 'does not demand the absence of the inference but merely requires that the proffered evidence be logically relevant independent of that inference.'") (citation omitted) (quoting *Snyder*, 874 P.2d at 1080).

as a logical matter that he knew that his conduct would have a particular result on [the day J.C. went into distress].

. . . .

[Here, t]he inference relied upon arises not from the criminal character of the accused, but from the demonstration of his pattern of engaging in a type of conduct to accomplish a particular end or result.

### A. Use of Other Act Evidence to Prove Mental State

¶ 31 As we see it, the issue on appeal is whether the acts against A.C. were logically relevant, independent of any inference of bad character, to prove the culpable mental state for each of the crimes allegedly committed against J.C., that is, first degree murder and child abuse resulting in death.

### 1. The "Knowing" and "Reckless" Culpable Mental States of the Crimes Charged

¶ 32 As pertinent here, section 18–3–102(1)(f), C.R.S.2011, provides that "[a] person commits the crime of murder in the first degree if . . . [t] he person knowingly causes the death of a child who has not yet attained twelve years of age and the person committing the offense is one in a position of trust with respect to the victim." A person acts knowingly "when he [or she] is aware that his [or her] conduct is practically certain to cause the result." § 18–1–501(6), C.R.S.2011.

¶ 33 Thus, with respect to the first degree murder charge here, the prosecution had to prove that defendant engaged in conduct which he was aware was practically certain to cause J.C.'s death. Cf. Mata–Medina v. People, 71 P.3d 973, 978 (Colo.2003) (discussing second degree murder's requirement that a person knowingly cause the death of another).

¶ 34 A person who commits child abuse under section 18–6–401(1)(a), C.R.S. 2011, is subject to punishment for a class 2 felony "when [he or she] act[ed] knowingly or recklessly and the child abuse results in

death to the child." § 18–6–401(7)(a)(I), C.R.S.2011.[6] As pertinent here, a person acts knowingly with respect to conduct or a circumstance described in a statute defining an offense "when he [or she] is aware that his [or her] conduct is of such nature or that such circumstance exists." § 18–1–501(6). A person acts recklessly "when he [or she] consciously disregards a substantial and unjustifiable risk that a result will occur." § 18–1–501(8), C.R.S.2011. A person acts with a conscious disregard of the risk created by his or her conduct when he or she is aware of the risk and chooses to act despite that risk. People v. Hall, 999 P.2d 207, 219 (Colo.2000).

¶ 35 In connection with the child abuse charge, the prosecution had to prove, with respect to the "knowing" mental state, only that defendant was aware of the abusive nature of his conduct in relation to J.C. or of the circumstances in which he committed an act against her well-being; and with respect to the "reckless" element, only that defendant was aware of (and consciously chose to disregard) a substantial and unjustifiable risk that his conduct could result in injury to her life or health. See People v. Deskins, 927 P.2d 368, 371 (Colo.1996) (the culpable mental states applicable to the crime of child abuse relate not to a particular result, but to the nature of the offender's conduct in relation to the child or to the circumstances under which an act or omission occurred; discussing reckless child abuse resulting in death); People v. Thompson, 756 P.2d 353, 356 (Colo.1988) (the defendant acted knowingly where he was aware of the abusive nature of his conduct, regardless of his specific awareness of certainty of death).

### 2. Legitimate Use of Other Bad Acts Evidence to Prove Knowledge or Recklessness

¶ 36 Other bad acts evidence is admissible to prove a defendant's knowledge or reckless mental state, see 1 Edward J. Imwinkelried, Uncharged Misconduct Evidence § 5:24, at 65–66 & § 5:39, at 115–16 (2009), when, during the course of the bad acts, (1) the defen-

---

**6.** However, if the crime is committed under circumstances qualifying as first degree murder of a child under twelve, a defendant is to be convict-

ed of first degree murder. § 18–6–401(7)(a)(I), (c), C.R.S.2011.

dant revealed guilty knowledge of a circumstance or risk;[7] (2) the defendant gained direct knowledge of a fact or risk relevant to a charged offense;[8] or (3) the defendant learned something which circumstantially provides evidence of knowledge (or recklessness) at the time of the crime;[9] or when (4) the other bad acts tend to prove the requisite knowledge by virtue of the doctrine of chances. *Id.* §§ 5:25 to 5:28.

¶ 37 Here, we are unconcerned with the first three modes of proving knowledge or recklessness. In his actions involving A.C., defendant did not reveal any guilty knowledge concerning his alleged acts against J.C. or gain, either directly or inferentially, knowledge of a fact, circumstance, or risk in relation to his treatment of J.C.

¶ 38 We are, then, concerned only with whether the evidence of defendant's acts involving A.C. would be admissible under the doctrine of chances to show his mental state with respect to his actions involving J.C.

¶ 39 "The reasoning underlying [the doctrine of chances] is that it is unlikely that the defendant would be repeatedly innocently involved in similar suspicious situations." *Id.* § 5:28, at 78; *see id.* § 5:06, at 16 ("The doctrine teaches us that the more often the defendant performs the actus reus, the smaller is the likelihood that the defendant acted with an innocent state of mind. The recurrence or repetition of the act increases the likelihood of a mens rea or mind at fault.") (footnotes omitted); *see also Douglas v. People,* 969 P.2d 1201, 1206 n. 6 (Colo. 1998) (quoting Imwinkelried's discussion of the doctrine of chances).

¶ 40 While "even dissimilar acts can be logically relevant to show intent," proof of similarity is required when, as here, the theory of logical relevance depends on the doctrine of chances. 1 Imwinkelried, *Uncharged Misconduct* § 5:05, at 14 & § 5:06, at 18; *see People v. Spoto,* 795 P.2d 1314, 1320 (Colo. 1990) ("Dissimilar prior acts are not probative under the doctrine of chances.... [S]imilarity is crucial when the theory of logical relevance is the doctrine of chances.").

¶ 41 "Perhaps the most important factor is whether the two acts required the same state of mind. After all, the ultimate question is whether the defendant had a particular state of mind—the mens rea—at the time of the actus reus alleged in the pleading." 1 Imwinkelried, *Uncharged Misconduct* § 5:09, at 31 (footnote omitted).

¶ 42 Accordingly, where, as here, other act evidence is offered to prove a mental state, "the prior conduct [must involve] the *same intent* that the prosecution seeks to establish in the charged offense." *People v. Spoto,* 772 P.2d 631, 633 (Colo.App.1988), *aff'd,* 795 P.2d 1314 (Colo.1990); *see also United States v. Cockrell,* 587 F.3d 674, 679 n. 1 (5th Cir.2009) ("Where the issue ... is the defendant's intent to commit the offense charged, the relevancy of the extrinsic offense derives from the defendant's indulging himself [or herself] in the same state of mind in perpetration of [both offenses] ....") (quoting *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978)); *United States v. Dickerson,* 248 F.3d 1036, 1047 (11th Cir. 2001) ("To establish relevance under [rule 404(b) ] ... where testimony is offered as proof of intent, 'it must be "determined that the extrinsic offense requires the same intent as the charged offense ...."'") (quoting *United States v. Cardenas,* 895 F.2d 1338, 1343 (11th Cir.1990)); *United States v. Torres,* 977 F.2d 321, 326 (7th Cir.1992) (courts must "examine each of the extrinsic ... acts

---

**7.** For example, a defendant makes a statement during either (1) a prior act, about an upcoming event, or (2) in a subsequent act, about a past act. *See* 1 Imwinkelried, *Uncharged Misconduct* § 5:25, at 68.

**8.** For example, in a public indecency case, the prosecution, to show that the defendant realized his neighbors could see him standing in the front room window, naked, could prove that, on prior occasions the police had warned him of complaints from his neighbors about such activity.

*See* 1 Imwinkelried, *Uncharged Misconduct* § 5:26, at 69–70.

**9.** For example, in a case involving allegations that the defendant knowingly received stolen goods from another, the prosecution could prove that the defendant had, on a prior occasion, received stolen goods, under suspicious circumstances, from the same individual. *See* 1 Imwinkelried, *Uncharged Misconduct* § 5:27, at 73–74.

in this case to determine whether [the defendant] committed them with the same type of ... intent that he allegedly harbored when he [committed the charged offense]"); *United States v. Mark*, 943 F.2d 444, 448 (4th Cir.1991) ("[T]he relevance of the evidence 'derives from the defendant's having possessed the same state of mind in the commission of both the extrinsic act and the charged offense.' ") (quoting *United States v. Dothard*, 666 F.2d 498, 502 (11th Cir.1982)); *United States v. McCollum*, 732 F.2d 1419, 1424 (9th Cir.1984) ("A past crime is not relevant to intent unless it required the same form of intent that the Government seeks to prove in the second case."); *United States v. Moody*, 763 F.Supp. 589, 598 (M.D.Ga.1991) ("Where extrinsic evidence is offered to prove intent, the charged crime and the extrinsic evidence must be similar enough in their characteristics to permit an inference that the defendant had the same state of mind when committing both acts."), *aff'd*, 977 F.2d 1420 (11th Cir.1992).

### 3. Application

¶ 43 In our view, evidence that, on other occasions, defendant, in anger, slapped, shook, and roughly handled a three-year-old, with no resulting serious bodily injury, has no tendency to make more or less probable the allegation that, in connection with the first degree murder charge, he knowingly caused J.C.'s death. This follows for the simple reason that defendant's past acts did not result in serious injury or death to A.C., and, thus, did not tend to demonstrate that he was aware his conduct was practically certain to cause A.C.'s (much less, J.C.'s) death.

¶ 44 Similarly, the evidence of defendant's other bad acts with respect to A.C. was not relevant to prove the culpable mental state of child abuse resulting in death.

¶ 45 In one sense, evidence of *any* past "knowing" or "reckless" abuse of a child could be said to tend to prove any "knowing" or "reckless" abuse of a child—even a different child—on a subsequent occasion. But this type of proof differs little, if at all, from impermissible proof of bad character or propensity—that because the person acted abusively in the past with some child, he is likely to have acted abusively on a subsequent occasion with any child. *See Harvey v. State*, 604 P.2d 586, 590 (Alaska 1979) ("Evidence of past abusive conduct is often available in child abuse cases and strictly speaking is never totally irrelevant. However, its relevance often exists only because it reflects on the propensity of a past offender to continue a pattern of child abuse. This is precisely the type of inference Rule 404(b) is intended to prevent."); *see also* 1 Imwinkelried, *Uncharged Misconduct* § 2:19, at 113 ("the prosecutor may not prove that the defendant is either generally a criminal or more particularly a rapist or burglar" to show that, on a particular occasion, the defendant acted in conformity therewith).

¶ 46 As noted above, CRE 404(b) does not always require similarity between a defendant's prior act and the charged offense. *Yusem v. People*, 210 P.3d 458, 467 (Colo. 2009). When seeking to prove intent by the doctrine of chances, however, "[t]he uncharged act should closely parallel the charged act," and "[i]f the acts are similar in material respects, the similarity justifies the admission of the acts to disprove innocent intent." 1 Imwinkelried, *Uncharged Misconduct* § 5:08, at 25; *cf. People v. Morales*, 2012 COA 2, ¶ 33, 298 P.3d 1000 (other act evidence offered to show, inter alia, intent was sufficiently similar to the charged offense where both incidents involved homes under renovation in which no one was living; both occurred on weekends; in both, expensive tools were stolen; the homes were close to each other; and the incidents took place within weeks of each other); *People v. McBride*, 228 P.3d 216, 227 (Colo.App.2009) (other act evidence offered to show intent and absence of mistake was sufficiently similar to the charged offense where all acts involved the defendant's violent behavior toward the same victim).

¶ 47 Here, defendant was alleged to have injured his infant daughter by hitting her hand with a hairbrush, violently shaking her, and slamming her against a hard surface. In our view, these alleged acts bear no resemblance to the other acts admitted against him at trial.

¶ 48 First, there is an obvious age discrepancy between the victims: defendant committed the other acts when A.C. was over three years old, and the acts charged in the present case, when J.C. was seven weeks old; second, the incidents did not occur in close proximity to each other: several months passed between the other acts and the charged offense; third, defendant's actions against each daughter were different: A.C. was not hit with an object, shaken violently, or slammed against a hard surface; fourth, defendant was angry before he allegedly abused A.C., but there was no indication he was angry before J.C. was injured; and fifth, the results of the events were different: A.C. did not suffer severe injuries as a result of defendant's actions.

¶ 49 Because of the dissimilarities between the prior acts against A.C. and the alleged acts against J.C., we conclude that the prior acts against A.C. were not relevant to prove the culpable mental state element of child abuse resulting in death. *See, e.g., State v. Gibson,* 144 Or.App. 523, 928 P.2d 344, 349 (1996) (evidence that two years after the disappearance of his young son, the defendant hit his young daughter was inadmissible because it did not tend to make it (1) less likely that the first disappearance was accidental and (2) more likely that he recklessly caused the son's death; rather, the evidence, if relevant at all, tended only to prove that "once a child abuser always a child abuser").

¶ 50 Consequently the trial court abused its discretion in admitting them for this purpose.

### B. Use of Other Act Evidence to Prove Absence of Mistake

¶ 51 The doctrine of chances also applies to the use of uncharged misconduct to disprove a claim of mistake or accident. *See* 1 Imwinkelried, *Uncharged Misconduct* § 5:11, at 40 & § 5:33, at 100. The differences mentioned above between the prior acts and the present case lead us to reject the court's conclusion that the evidence was properly admitted to prove that defendant did not mistakenly or accidentally cause J.C.'s death. Consequently, we conclude that the trial court abused its discretion in admitting the evidence for these purposes as well.[10]

### C. Harmless Error

¶ 52 Because defendant objected to the admission of the evidence in the trial court, we now consider whether the court's error was prejudicial or harmless to defendant. In his opening brief, defendant argued that the error was prejudicial because "no evidence is as likely to inflame the passions of a jury and produce a verdict based on prejudice as is evidence that the defendant has a history of violence and abuse towards his own daughters," and because "the case hinged, almost entirely, on a battle of experts":

> Thus, in light of the highly controverted and less than overwhelming evidence of the defendant's guilt, the improper introduction of the prior, alleged incidents involving A.C. was extremely prejudicial.

¶ 53 In their answer brief, the People did not address this issue.

10. We recognize that the doctrine of chances can also be used to prove the actus reus of a crime. *See Everett,* 250 P.3d at 658. To admit evidence of other acts under the doctrine of chances to prove the actus reus, the other acts must be roughly similar to the charged crime, and the number of unusual occurrences in which the defendant has been involved must exceed the frequency rate for the general population. *Id.* Here, although defendant asserted that J.C.'s injuries were attributable to a fall off the bed, the prosecution did not offer defendant's prior acts with respect to A.C. as proof that he had caused her injuries. Nor, in our view, could it have done so. For the reasons detailed in the text, defendant's treatment of A.C. was not "roughly similar" to his alleged abuse of J.C. And the number of unusual occurrences could not be said to exceed the frequency rate for the general population. *See* Mark Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape: People v. Ewoldt Reconsidered,* 29 U.C. Davis L.Rev. 355, 389 (Winter 1996) (although "similar happenings offered to prove actus reus need not be unique or distinctive," "[t]he probative value of the evidence derives from the coincidence of the *same rare ... event* occurring repeatedly to the same individual"; and, for the evidence to be probative, "the number of events must be shown to be significantly more numerous than would be expected in the absence of design") (emphasis added).

¶ 54 We are not required to search the record for harmless error when the People have not argued the point. Such a requirement would be

troublesome in two respects. First, it would place a heavy burden on the reviewing court, deprived as it would be of the guidance of the parties on the question whether particular errors were harmless. Second, it would invite salami tactics. In its main brief and at oral argument the government would argue that there was no error, hoping to get us to endorse its view of the law. If it failed in that endeavor it would file a petition for rehearing, arguing as it does in this case that it should win anyway because the error was harmless. Such tactics would be particularly questionable in a case such as this where the defendant goes out of his way to argue that the error of which he complains was prejudicial, and the government by not responding signals its acquiescence that if there was error, it indeed was prejudicial.

*United States v. Giovannetti*, 928 F.2d 225, 226 (7th Cir.1991) (per curiam); *see also United States v. Pryce*, 938 F.2d 1343, 1347 (D.C.Cir.1991) ("Where a court analyzes the harmless error issue wholly on its own initiative, it assumes burdens normally shouldered by government and defense counsel. This drain on judicial resources inevitably causes delay for parties in other cases. More important, where the case is at all close, defense counsel's lack of opportunity to answer potential harmless error arguments may lead the court to miss an angle that would have shown the error to have been prejudicial.") (citation omitted).

¶ 55 Nevertheless, an appellate court is authorized to disregard a harmless error even when a harmless error argument has not been made in the briefs. *See, e.g., Giovannetti*, 928 F.2d at 226 ("If it is certain that the error did not affect the outcome, reversal will not help the party arguing for reversal beyond such undeserved benefits as he may derive from delay. And reversal will hurt others: not merely the adverse party, whose failure to argue harmlessness forfeits his right to complain about the injury, but innocent third parties, in particular other users of the court system, whose access to that system is impaired by additional litigation.") (citation omitted).

¶ 56 "The reversal of a conviction entails substantial social costs: it forces jurors, witnesses, courts, the prosecution, and the defendants to expend further time, energy, and other resources to repeat a trial that has already once taken place; [and] victims may be asked to relive their disturbing experiences." *United States v. Mechanik*, 475 U.S. 66, 72, 106 S.Ct. 938, 942, 89 L.Ed.2d 50 (1986). These costs are "acceptable and ... necessary" when, because of an error, a defendant has been deprived of "a fair determination of the issue of guilt or innocence." *Id.* at 72, 106 S.Ct. at 943. "But the balance of interest tips decidedly the other way when an error has had no effect on the outcome of the trial." *Id.*

¶ 57 Because of the nature of the case, and the significant societal costs attending a retrial, in the initial opinion issued in this case, we undertook a harmless error analysis despite the People's failure to argue that point. And we concluded that, as argued by defendant, the error was prejudicial, warranting a new trial.

¶ 58 In response to our initial opinion, the People filed a petition for rehearing, extensively arguing that we should have held the trial court's error harmless. We acknowledge that, by not arguing this point until the petition for rehearing was filed, the People reduced the likelihood that defendant would have an opportunity to respond. *See* C.A.R. 40(a) ("No answer to a petition for rehearing will be received unless requested by the court."). Indeed, it is for this reason that we will ordinarily not address arguments raised for the first time in a petition for rehearing. *See, e.g., People v. Gallegos*, 260 P.3d 15, 29 (Colo.App.2010) ("We will not address an argument raised for the first time in [the defendant's] petition for rehearing."); *Kelly v. Cent. Bank & Trust Co.*, 794 P.2d 1037, 1044–45 (Colo.App.1989) (when one party raises an issue for the first time in a petition for rehearing, "we consider it not properly before us and, therefore, do not decide it herein"); *cf. Giovannetti*, 928 F.2d at 226–27 (disapproving tactic of raising

harmless error argument for the first time in petition for rehearing).

¶ 59 That said, in their petition for rehearing, the People addressed an issue that we had opted to address in our initial opinion. Given this circumstance, as well as the magnitude of the crimes alleged in this case, we elect to take the unusual step of addressing the People's belated harmless error argument. We do so, however, after having (1) directed defendant to respond to the People's harmless error argument; (2) considered defendant's response; and (3) closely examined the record, in light of governing (and more specific) legal standards for differentiating between prejudicial and harmless error.

¶ 60 Because the trial court's error is not one of constitutional dimension, *Yusem*, 210 P.3d at 469 n. 16, defendant bears the burden of showing prejudice from the error. *People v. Vigil*, 718 P.2d 496, 500 (Colo.1986).

■ ¶ 61 An error of nonconstitutional dimension is prejudicial where there is a reasonable probability that it contributed to a defendant's conviction by substantially influencing the verdict or impairing the fairness of the trial. *People v. Jones*, (Colo.App.2011) (*cert. granted* 2012 WL 1820863 (May 21, 2012)). Where there is not a reasonable probability that such an error contributed to a defendant's conviction, the error will be disregarded as harmless. *People v. Vecellio*, 2012 COA 40, ¶ 53, 292 P.3d 1004.

¶ 62 To obtain reversal here, then, defendant "must establish a reasonable probability that the [other bad acts] evidence contributed to [his] conviction." *See* 2 Imwinkelried, *Uncharged Misconduct* § 9:86, at 9–278 to 279.

¶ 63 As used in this context, "a reasonable probability" does not mean that it is "more likely than not" that the error caused the defendant's conviction. *See Krutsinger v. People*, 219 P.3d 1054, 1060 n. 3 (Colo.2009). Instead, it means only a probability sufficient to undermine confidence in the outcome of the case:

If we assume a spectrum of probabilities with zero percent at one end representing no likelihood of a different result and one hundred percent at the other end representing absolute certainty of a different result, we can array verbalizations of probabilities across that spectrum. A "mere possibility" is at the low end of the spectrum, "near certainty" is at the high end, and "more probable than not" is a likelihood greater than fifty percent. . . .

. . . [T]he United States Supreme Court has stated: "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Although the United States Supreme Court's interpretation of "reasonable probability" is not binding on this Court when construing state criminal rules, we are persuaded that defining the substantively identical term "reasonable likelihood" by reference to a reviewing court's confidence in the outcome of trial makes good sense in determining whether reversible error has occurred. Rules that govern criminal proceedings are meant to ensure that a trial is a search for truth and that the verdict merits confidence. It is entirely consistent with this aim to require that when error has eroded a reviewing court's confidence in the outcome of a particular trial, we should start over and conduct a new trial.

*State v. Knight*, 734 P.2d 913, 919–20 (Utah 1987) (footnote and additional citation omitted) ("For an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict."); *see also, e.g., United States v. Rodriguez*, 398 F.3d 1291, 1299 (11th Cir. 2005) ("[T]he familiar reasonable probability of a different result formulation . . . means a probability ' "sufficient to undermine confidence in the outcome." ' ") (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83, 124 S.Ct. 2333, 2340, 159 L.Ed.2d 157 (2004)); *State v. Kleser*, 328 Wis.2d 42, 786 N.W.2d 144, 164 (2010) (a "reasonable probability of a different outcome" means a "probability sufficient to undermine confidence in the outcome") (quoting *State v. Dyess*, 124 Wis.2d 525, 370 N.W.2d 222, 232 (1985)).

■ ¶ 64 In assessing the effect of improperly admitted bad acts evidence, an ap-

pellate court considers a number of factors, namely, "the overall strength of the state's case, the impact of the improperly admitted or excluded evidence on the trier of fact, whether the proffered evidence was cumulative, and the presence of other evidence corroborating or contradicting the point for which the evidence was offered." *State v. Martin V.*, 102 Conn.App. 381, 926 A.2d 49, 54 (2007) (quoting *State v. Calabrese*, 279 Conn. 393, 902 A.2d 1044, 1056 (2006)); *see Blecha v. People*, 962 P.2d 931, 943 (Colo. 1998) (applying similar factors, in evaluating impact of constitutional error in admitting hearsay in violation of a defendant's confrontation rights); *see also State v. Streich*, 163 Vt. 331, 658 A.2d 38, 49 (1995) (noting that, whether an error in admitting evidence is of constitutional or nonconstitutional dimension, "the factors that guide our [harmless error] inquiry [should be] the same").

¶ 65 "When the court improperly admitted uncharged misconduct evidence, 'the most relevant factors to be considered are the strength of the state's case and the impact of the improperly admitted evidence on the trier of fact.'" *Martin V.*, 926 A.2d at 54 (quoting *State v. Sawyer*, 279 Conn. 331, 904 A.2d 101, 118 (2006), *overruled on other grounds by State v. DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008)).

¶ 66 After carefully considering, in light of the above-mentioned principles, the People's petition for rehearing, defendant's response thereto, and the record, we now conclude that defendant has failed to demonstrate prejudicial error.

¶ 67 In reaching this conclusion, we acknowledge the danger that is created whenever a trial court erroneously admits evidence of uncharged misconduct.[11] And we are aware that the danger is especially great when the evidence involves bad acts against children.[12] Indeed, some acts of child abuse could be so disturbing that, if erroneously admitted into evidence, they would require reversal (because the jury would want to convict the defendant of the charged offense to punish him for the uncharged misconduct). But the alleged misconduct here is not of this type.

¶ 68 Further, a close examination of the record reveals that defendant's alleged abuse of A.C. did not play a significant role in the case. Inclusive of opening statements and closing arguments, the trial here lasted four days, comprising 748 pages of transcript. Only two of the prosecution's twelve witnesses mentioned the A.C. incidents; fewer than five pages of transcript were devoted to the prosecution's elicitation of that evidence *and* comment upon it in closing argument; and fewer than six pages were devoted to defendant's eliciting testimony about or commenting on the incidents. The description of the alleged acts against A.C. did not even appear on all of those pages: although the acts were specifically described by the two witnesses, neither party repeated those descriptions in opening statements or closing arguments (i.e., the prosecution generically referenced the incidents as involving "anger issues," and defendant described them as his having been "rough" or having "interactions" with A.C.). *Cf.* 2 Imwinkelried, *Uncharged Misconduct* § 9:87, at 9–288 ("If the amount of testimony focusing squarely on the charged offense dwarfs the uncharged misconduct evidence, there is a reduced probability that the uncharged misconduct caused the conviction.").

¶ 69 Moreover, "the single most important factor" in a nonconstitutional harm-

**11.** "Studies ... indicate that the admission of a defendant's uncharged misconduct significantly increases the likelihood of a jury finding of liability or guilt" because it "stigmatizes the defendant[,] and predisposes the jury to find him liable or guilty." 1 Imwinkelried, *Uncharged Misconduct* § 1:2, at 6; *see also Thompson v. State*, 612 N.E.2d 1094, 1097 n. 6 (Ind.Ct.App.1993) (quoting Imwinkelried with approval).

**12.** *See Montgomery v. State*, 810 S.W.2d 372, 397 (Tex.Crim.App.1990) ("[M]isconduct involving children [is] inherently inflammatory.... [It poses] a grave potential for [a] decision on an improper basis, as jurors may [lose] sight of specific issues they [are] called upon to decide and convict[ ] ... out of a revulsion against [the defendant's] parental demeanor."); *accord State v. Miller*, 608 N.W.2d 437 (Wis.Ct.App.1999) (unpublished table disposition) ("Inquiry about allegations of child abuse is inflammatory and appeals to the jury's natural revulsion towards such conduct.").

less error inquiry is whether the case was "close." *United States. v. Ince*, 21 F.3d 576, 584 (4th Cir.1994) (quoting *United States v. Urbanik*, 801 F.2d 692, 699 (4th Cir.1986)).

> [A]ppellate assessment of the "closeness" of an issue as it probably appeared to a jury is of course a highly judgmental process, involving much more of feel than of science. While assessing closeness necessarily requires looking to the probative force of other evidence tending to prove the issue, that . . . is not for the purpose of determining whether, if independently considered, that evidence would have sufficed to convict. The inquiry into "closeness" instead involves assessing whether the other evidence is not only sufficient to convict, but whether it is sufficiently powerful in relation to the tainted evidence to give "fair assurance" that the tainted evidence did not "substantially sway" the jury to its verdict.

*Ince*, 21 F.3d at 584 (quoting *Urbanik*, 801 F.2d at 699).

¶ 70 Here, there were no eyewitnesses, other than defendant, to what happened to J.C.; defendant had proffered, in his out-of-court statements, an innocent explanation for her injuries and death; and there was conflicting expert testimony on the cause of J.C.'s injuries. That said, however, the case against defendant was not "close."

¶ 71 The central issue in the case was whether or not the injuries that caused J.C.'s death were attributable to an accident. The prosecution presented circumstantial evidence tending to disprove defendant's explanation of accident (i.e., defendant, upon his arrest, asked, "What do I have to do to get out of this?"; the girlfriend delayed reporting J.C.'s supposed fall off the bed until the preliminary hearing two and a half months after J.C.'s death, and gave an inconsistent statement regarding the fall at trial; and the girlfriend, after defendant's arrest, replaced the bed that J.C. allegedly fell off with another bed of a different height).[13] In addition, the prosecution presented testimony from five experts, each of whom was recognized as an expert in a distinct area of medicine,[14] and all of whom unequivocally opined that J.C.'s fatal head injuries were the result of nonaccidental trauma.

¶ 72 In his defense, defendant presented only one witness—a pathology expert who testified about the possible causes of J.C.'s head and other injuries.

¶ 73 A "close case" can exist when experts on either side are in "sharp dispute" as to the central issue in the case. *See Gompers v. Finnell*, 35 Mass.App.Ct. 91, 616 N.E.2d 490, 493 (1993) (where "inadmissible opinions went to a central issue in the case, as to which the two expert witnesses were in sharp dispute," error was not harmless); *McCourt v. J.C. Penney Co.*, 103 Nev. 101, 734 P.2d 696, 698 (1987) ("Where there is a sharp conflict in the evidence upon essential issues, . . . the error is more likely to be found prejudicial."); *see also United States v. Hitt*, 981 F.2d 422, 425 (9th Cir.1992) (where experts on each side gave directly conflicting testimony regarding the central issue, case was "close"); *cf. State v. Solomon*, 144 Vt. 269, 476 A.2d 122, 125 (1984) (where experts gave conflicting opinions as to the main issue, there was not overwhelming evidence of the defendant's guilt).

¶ 74 Here, although the parties presented opposing expert testimony, the experts' opinions were not directly conflicting, or sharply in dispute, as to the central issue in the case.

¶ 75 Based upon her constellation of injuries (generally), and her skull fracture and brain injuries (specifically), the experts opined that J.C. died as a result of "non-accidental trauma," "severe inflicted traumat-

---

**13.** The dissent posits that the jury could have confused defendant's observed conduct against A.C. with the circumstantial evidence of J.C. injuries because, immediately after the witness testified regarding defendant's throwing A.C. into a car, the prosecutor asked whether the witness visited J.C. in the hospital. However, because the prosecutor prefaced the visit to the hospital question by reminding the witness (and the jury) of the date on which J.C. was taken to the hospital, it is unlikely that the jury would have been confused about the two incidents.

**14.** These areas were emergency medicine, internal pediatric medicine and pediatric critical care, forensic pathology, pediatric neurosurgery, and pediatrics and diagnosing and treating child abuse.

ic brain injury," "shaken impact syndrome," "rapid acceleration brain injury," "blunt force trauma," "homicide," and "child physical abuse." [15]

¶ 76 In contrast, defendant's theory was that J.C. rolled off a bed and struck her head a week before she died, and was awake and responsive on the morning that she was taken to the hospital. In support of this theory, defendant's pathologist opined that a short fall from a bed and normal childbirth could cause a skull fracture, that J.C. had blood in her brain that was at least a week old, and that J.C. did not have any neck or spinal cord injuries that normally accompany a shaking.

¶ 77 However, defendant's expert could (or would) not give an opinion on the manner of J.C.'s death. Although she stated that there were "factors that led her to believe that there may be other explanations [than non-accidental injury] for what happened to J.C.," she conceded that it "could be" non-accidental trauma. And, when asked her "opinion about the manner of [J.C.'s] death," she said, "I can't tell you ... because it should have been worked up a little more thoroughly to draw that conclusion."

¶ 78 In our view, because defendant's expert (and sole witness) was unable to opine that J.C.'s fatal injuries were accidentally inflicted, the central issue in this case was not *sharply* disputed, and, consequently, the case was not "close" because of "dueling experts."

¶ 79 Additionally, the People's experts undermined the plausibility of defendant's theory that J.C. had, a week earlier, rolled off a bed and struck her head:

- Two experts testified that children of J.C.'s age cannot roll over;

- Four experts opined that a short fall from a bed could not have caused the injuries J.C. sustained [16];

- Two experts opined that a fall from a bed would be inconsistent with J.C.'s injuries because a fall would create a brain injury "localized ... where the skull fracture was" instead of the "multi-focal [skull] injuries" in J.C.'s case. Indeed, the pathologist testified that J.C.'s head injuries were indicative of "at least four direct impacts ... the fracture ... being the worst one";

- Three experts testified regarding the type of force needed to inflict J.C.'s injuries: the first equated it to a "very severe car wreck" or hitting someone with a baseball bat; the second called it "violent" and "tremendous"; and the third stated that it was the "equivalent of grabbing ... a child around the torso ... and forcefully slamming [him or her] against the floor or counter";

- Two experts opined that J.C.'s injuries resulted from "recent trauma," which occurred either the morning of or "minutes or an hour preceding" her arrival at the hospital";

- Four experts testified that there was no evidence of "old" blood in J.C.'s brain; and

- All five experts opined that J.C.'s "catastrophic" injuries would have produced immediate symptoms, that is, she would not have had any period of lucidity, and would not have been able to make eye contact, smile, or drink a bottle.[17]

¶ 80 Under these circumstances, it must be recognized that the prosecution presented a strong case against defendant, apart from

15. None of the experts wavered on, or retreated from, these opinions during cross-examination. In light of this evidence, we disagree with the dissent's suggestion that the evidence may have been weak on the cause of J.C.'s injuries.

16. On cross-examination, the pathologist acknowledged that a "low level" fall could cause a subdural hematoma; however, on redirect, the doctor clarified that J.C. did not die of a subdural hematoma, as well as that, although there was a one in two million chance that a short fall could

be fatal, she would not expect to see J.C.'s constellation of injuries from a short fall.

In addition, another expert testified that a fall from a third or fourth story floor onto concrete—and not a fall from a bed—could have produced J.C.'s injuries.

17. The prosecution's experts also testified that (1) J.C.'s skull fracture did not result from the birthing process and (2) neck injuries are uncommon in shaken baby cases.

the inadmissible other bad acts evidence concerning A.C.

¶ 81 Given the few (including, sometimes only generic) references to the inadmissible evidence, and the legitimate strength of the prosecution's case against defendant, we conclude that defendant has not shown a reasonable probability that the error in admitting the evidence contributed to his conviction: the likelihood of a different outcome, if the evidence had not been admitted, is not sufficiently high to undermine our confidence in the jury's verdict. Consequently, the error was harmless.

¶ 82 The judgments of conviction are affirmed.

Judge TAUBMAN concurs.

Judge FOX dissents.

Judge FOX dissenting.

¶ 83 I agree with Parts I, II, III.A, and III.B of the majority opinion. I respectfully dissent from Part III. C, the portion of the opinion affirming the judgment of conviction on the basis of harmless error. Instead, I would, as the original opinion concluded, reverse the conviction and remand for a new trial.

¶ 84 There is no dispute that defendant, through counsel, lodged appropriate objections to the introduction of the other acts evidence. Having concluded that the admission of the other acts evidence was error, this division is next asked to determine whether the introduction of that evidence prejudiced defendant. Error is deemed harmless where there is no reasonable probability that the error contributed to the defendant's conviction by substantially influencing the verdict or impairing the fairness of the trial. *People v. Jones*, (Colo.App.2011) (*cert. granted* 2012 WL 1820863 (May 21, 2012)); *see also Yusem v. People*, 210 P.3d 458, 469 (Colo.2009) (recognizing that the proper inquiry is not whether "there was sufficient evidence to support the verdict without the improperly admitted evidence, but, rather, whether the error substantially influenced the verdict or affected the fairness of the trial proceedings" (quoting *People v. Gaffney*, 769 P.2d 1081, 1088 (Colo.1989))). The majority concludes

that the error was harmless. I must, respectfully, disagree.

¶ 85 In a child abuse case like this, where emotions are especially heightened, the reasonable probability that the other acts evidence would sway a jury is unmistakable. *See Montgomery v. State*, 810 S.W.2d 372, 397 (Tex.Crim.App.1990) (recognizing the inherently inflammatory nature of evidence of misconduct involving children); *State v. Miller*, 1999 WL 1240911, *3 (Wis.Ct.App. No. 98–3546–CR, Dec. 22, 1999) (unpublished table decision) (recognizing that allegation of child abuse is "inflammatory" and appeals to "the jury's natural revulsion" against such abuse). The majority recognizes as much, referencing studies that indicate that "the admission of a defendant's uncharged misconduct significantly increases the likelihood of a jury finding of liability or guilt" because the defendant is stigmatized and the jury is predisposed "to find him liable or guilty." *See also People v. Lewis*, 69 N.Y.2d 321, 514 N.Y.S.2d 205, 506 N.E.2d 915, 916–17 (1987) (recognizing that "juries attribute too much significance" to prior acts evidence).

¶ 86 The danger that other misconduct, independent of the charged crime, can bias a jury forms the basis of fundamental principles of our legal system, including that

> a person is tried only for those crimes with which he has been charged; the penalties of criminal law are appropriately imposed only for the unlawful activity charged, not for bad character or predisposition; [and] admissible evidence at trial is generally limited to proof of [those] events which form the bases of the charges.

*Ali v. United States*, 520 A.2d 306, 309 (D.C. 1987).

¶ 87 Because defendant was the only person with the child the day of her injuries, the case is necessarily based on circumstantial evidence. Thus, both sides relied on various experts, including forensic experts, to persuade the jury what happened to the child, how it happened, and who was responsible.

¶ 88 Most of the doctors' trial testimony focused on the injuries to the child. Concededly, there was overwhelming evidence

about those injuries. The evidence was, however, weakest on the cause of those injuries. Throughout trial, defendant's counsel focused on persuading the jury that J.C.'s injuries were accidental or were not caused by defendant, while the prosecution focused on proving that defendant non-accidentally caused J.C.'s injuries.

¶ 89 Without the benefit of the jury's deliberations, which are necessarily confidential, it is impossible to know how the trial would have ended based on the expert opinion alone, and without the "other acts" evidence. *See generally, Yusem,* 210 P.3d at 470 (analyzing whether the admission of other acts evidence was reversible error and concluding that prejudicial evidence that discredited defendant's testimony "may have unfairly tipped the scales in favor of the People"); *see also People v. Salazar,* 2012 CO 20, ¶ 27, 272 P.3d 1067 (concluding that the trial court abused its discretion in granting the defendant's motion to introduce evidence of an alternative suspect's prior sexual conduct, in part because of the risk of confusion of the issues material to the case). The record shows, however, that defendant and his counsel knew from the start that the trial court would allow evidence of the two 2006 dissimilar incidents against A.C. that occurred more than three years before defendant's trial and more than five months before J.C.'s injuries. That evidence was extremely damaging and largely unconnected to the current charges related to J.C. *See, e.g., Kaufman v. People,* 202 P.3d 542, 555 (Colo.2009) (although defendant collected knives, his collection did not include a knife like the one used in the altercation at issue; thus, the court concluded that it was inappropriate for the prosecution to parade "evidence before the jury merely to paint a picture of [defendant] as a bad person"); *State v. Price,* 80 Ohio App.3d 35, 608 N.E.2d 818, 822 (1992) (concluding that admission of evidence of defendant's sexual conduct with an older stepdaughter, which did not involve the victim of the current charges, was inadmissible and prejudicial where it was not "so connected with the acts for which [defendant] was convicted that proof of one incidentally involves the other").

¶ 90 So damaging was the evidence that defendant's counsel opened the case by asking the jury not to judge the then twenty-one-year-old defendant by whether his eighteen-year-old girlfriend's family liked him or by whether that same family accused him of mistreating A.C., who was about three years older than J.C. and was injured in a different manner and under different circumstances many months earlier.

¶ 91 As the majority agrees, the trial court's admission of these two separate incidents against A.C. was improper. *See also Shepard v. United States,* 290 U.S. 96, 104, 54 S.Ct. 22, 78 L.Ed. 196 (1933) (noting, before the adoption of the Federal Rules of Evidence, the extent of judicial discretion to admit or exclude evidence: "When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out."). First, J.C. and A.C.'s maternal grandfather testified that, in June 2006, he observed defendant slap A.C. on the cheek, while arguing with A.C.'s aunt, leaving a red handprint that later turned into a bruise. Next, J.C.'s and A.C.'s maternal great-grandmother was allowed to testify that at a family function, which occurred many months before J.C. was injured, she saw defendant holler at his girlfriend, the children's mother, and he then grabbed A.C. by the arm, threw her into the car, and smacked her in the arm before leaving. The prosecutor immediately followed that graphic testimony by asking the great-grandmother whether she went to the hospital on October 7, 2006, to see J.C., without making a clear distinction between A.C. and J.C. The jury then could have easily confused defendant's observed conduct against A.C. with the circumstantial evidence surrounding J.C.'s injuries. *See Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948) (recognizing that, even when the evidence is probative, the "overriding policy of excluding such evidence ... is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice").

¶ 92 Despite defense counsel's efforts to show that other people had access to J.C. in the days before she was injured and that defendant's interactions with J.C. were play-

ful rather than intended to harm her, the jury's impartiality had been irreversibly contaminated with the suggestion that defendant was a child abuser (by having struck the older child on two separate unrelated prior occasions in a manner different from the injury to J.C.) with a bad temper (by having "hollered" at the girlfriend). *See State v. Fernane,* 185 Ariz. 222, 914 P.2d 1314, 1318–19 (App.1995) (concluding that the trial court abused its discretion in admitting other highly prejudicial evidence related to abuse and injuries sustained by defendant's other children in a child abuse and felony murder case relating to abuse of her two-year-old younger child); *Price,* 608 N.E.2d at 822.

¶ 93 Because I cannot say that the other acts evidence did not impair the fairness of this trial or that there was a reasonable probability that the erroneously admitted evidence did not contribute to this conviction, I would reverse and remand for a new trial. *Yusem,* 210 P.3d at 469; *Jones,* 2012 WL 1820863; *see also Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (noting that a reasonable probability "is a probability sufficient to undermine confidence in the outcome").