1
 2024 CO 56 Ricardo Castro, Petitioner v. The People of the State of Colorado, Respondent No. 22SC712
Supreme Court of Colorado, En Banc
July 1, 2024
 
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 18CA2389
 
 
          Judgment
 Affirmed
 
 2
 
          
 Attorneys for Petitioner:
 
 
           Megan
 A. Ring, Public Defender Meredith K. Rose, Deputy Public
 Defender Denver, Colorado
 
 
          
 Attorneys for Respondent:
 
 
           Philip
 J. Weiser, Attorney General Frank R. Lawson, Assistant
 Attorney General Denver, Colorado
 
 
          
 JUSTICE SAMOUR delivered the Opinion of the Court, in which
 CHIEF JUSTICE BOATRIGHT, JUSTICE MARQUEZ, JUSTICE HART, and
 JUSTICE BERKENKOTTER joined. JUSTICE GABRIEL, joined by
 JUSTICE HOOD, concurred in the judgment.
 
 3
 
          
 OPINION
 
 
          
 SAMOUR, JUSTICE
 
 
          ¶1
 Trial by jury is perhaps the most vital cog in the wheel of
 our criminal justice system. We have long attached
 "great importance to the concept of relying on a body of
 one's peers to determine guilt or innocence as a
 safeguard against arbitrary law enforcement."
 Williams v. Florida, 399 U.S. 78, 87 (1970).
 Accompanying this hallowed tradition is the right in felony
 cases to a fair and unanimous verdict by a jury of twelve
 free from outside interference. Colo. Const. art. II, §
 23; Ramos v. Louisiana, 590 U.S. 83, 90-93 (2020);
 People v. Boulies, 690 P.2d 1253, 1255-56 (Colo.
 1984). Because the incapacitation of a juror in the middle of
 deliberations can place this right in jeopardy, our court has
 developed a framework to shield the right while preventing a
 mistrial. We now reaffirm this framework.
 
 
          ¶2
 In the case before us, a juror became incapacitated after
 deliberating for approximately nine hours on felony charges
 brought against the defendant, Ricardo Castro. To salvage the
 trial, the court replaced the unavailable juror with an
 alternate juror. Although it acknowledged that
 mid-deliberations juror substitution raises a presumption of
 prejudice to the defendant, People v. Burnette, 775
 P.2d 583, 590 (Colo. 1989), it rightly explained that such a
 presumption may be overcome by taking the thorough
 precautions developed in Burnette and
 
 4
 
 Carrillo v. People, 974 P.2d 478, 492 (Colo. 1999).
 After applying such precautions, the court instructed the
 reconstituted jury to begin deliberations anew.
 
 
          ¶3
 The reconstituted jury deliberated for five and a half hours
 and then returned a guilty verdict. Castro appealed, arguing
 that the trial court had reversibly erred by replacing a
 regular juror with the alternate juror. But a division of the
 court of appeals upheld the trial court's actions.
 People v. Castro, No. 18CA2389, ¶¶ 6, 29
 (Aug. 11, 2022).
 
 
          ¶4
 Before us, Castro maintains that whether the trial court has
 authority to replace a regular juror with an alternate juror
 after deliberations have begun presents a question of
 statutory interpretation subject to de novo review. Relying
 on that standard of review, he urges us to conclude that the
 controlling statute, section 16-10-105, C.R.S. (2023), does
 not allow for the mid-deliberations substitution of a juror
 and, therefore, the trial court erred. Castro then reminds us
 that in James v. People, 2018 CO 72, 426 P.3d 336,
 we adopted a harmlessness standard of reversal in a situation
 in which the alternate juror was inadvertently permitted to
 be present and briefly participate as a thirteenth juror
 during the first ten minutes of deliberations. This, he
 asserts, is also the appropriate standard of reversal in a
 mid-deliberations juror-substitution situation. Consequently,
 he asks us to reject the presumption-of-prejudice standard of
 reversal from Burnette and Carrillo. And,
 because in his view the People have failed to establish that
 the
 
 5
 
 mid-deliberations substitution in this case was harmless, he
 argues that his conviction must be reversed.[1]
 
 
          ¶5
 We see it differently. Because section 16-10-105 is ambiguous
 as to whether a trial court has authority to replace a
 regular juror with an alternate juror during deliberations,
 there is no way to assess whether a trial court errs in
 making such a substitution. But regardless of whether
 substituting a regular juror with an alternate juror during
 deliberations is error, it is potentially prejudicial to the
 defendant. So, instead of delving into the appropriate
 standard of review to ascertain whether an error occurred
 here, we presume that a mid-deliberations substitution of a
 regular juror with an alternate juror always prejudices the
 defendant. It follows that the only relevant inquiry for us
 is whether reversal is warranted. And that question turns on
 whether the precautions employed by the
 
 6
 
 trial court, when considered in light of the surrounding
 circumstances, overcome the presumption of prejudice to the
 defendant.
 
 
          ¶6
 Hence, today, we explicitly proclaim the continued vitality
 of the principle we first articulated over three decades ago
 in Burnette and then reinforced a decade later in
 Carrillo: Substitution of a regular juror with an
 alternate juror during deliberations raises a presumption of
 prejudice to the defendant's right to a fair trial, but
 that presumption may be overcome by taking the precautions
 delineated in those cases.[2] This is the standard of reversal we
 apply here.[3]
 
 
          ¶7
 Any contention that it is improper to use the
 presumption-of-prejudice standard in this factual scenario
 without first finding (or at least assuming)
 error—because it's a standard of reversal—is
 an attempt to exhume a hypothesis that has been six feet
 under since we necessarily buried it in Carrillo.
 The Carrillo court used this standard of reversal
 without first finding or assuming error.
 
 7
 
 Irrespective of whether there was error, it felt
 compelled to impose a rebuttable presumption of prejudice
 vis-a-vis Carrillo's right to a fair trial.
 
 
          ¶8
 Here, applying Burnette and Carrillo, as we
 must, we conclude that the trial court complied with the
 precautions laid out in those cases. Indeed, the trial
 court's approach provides a textbook example of the
 proper effectuation of the teachings of Burnette and
 Carrillo. Because the meticulous precautions
 employed by the trial court were sufficient under the
 circumstances of this case to rebut the presumption of
 prejudice to Castro, we affirm the division's
 judgment.[4]
 
 
          I.
 Facts and Procedural History
 
 
          ¶9
 Castro lived with N.G., a child, and her grandmother for some
 months. During that timeframe, Castro dated N.G.'s
 grandmother and became close with N.G. and the rest of her
 family. When Castro and N.G.'s grandmother broke up, he
 left Denver but remained in contact with the family. Several
 years later, he returned to Denver, and N.G.'s
 grandmother allowed him to stay with her while he resettled.
 
 8
 
          ¶10
 Shortly after Castro's return, N.G., who was nine at the
 time, spent a weekend with her grandmother and slept in her
 grandmother's bed. One day, Castro returned home at 5
 a.m. and insisted on sleeping in the bed with the two of
 them, instead of in his own bed in a separate room.
 N.G.'s grandmother acquiesced. When the grandmother later
 got up to use the bathroom, Castro scooted closer to N.G.,
 pulled down her pajama pants and underwear, and started
 fondling her vagina. Castro then inserted his penis into
 N.G.'s vagina, causing her pain, and repeatedly whispered
 in her ear, "It's okay, sweetheart." When he
 heard the grandmother returning, he stopped and moved to the
 other side of the bed.
 
 
          ¶11
 N.G. made an outcry, and the People subsequently charged
 Castro with sexual assault on a child and sexual assault on a
 child by one in a position of trust. At the end of
 Castro's jury trial, counsel delivered their closing
 arguments on a Thursday afternoon. The court then announced
 that Juror W was the alternate juror. Before Juror W left the
 courtroom, the trial judge instructed her that he was not
 discharging her but merely recessing her, and that she
 remained "under all the same admonitions that [she was]
 under during the trial." That is, she had to (1) keep an
 open mind and (2) avoid internally deliberating about the
 case, discussing it with anyone, and viewing any media
 coverage of it. The twelve regular jurors commenced
 deliberations that afternoon.
 
 9
 
          ¶12
 On Friday, the jury continued deliberations before recessing
 for the weekend. Between Thursday and Friday, the jury
 deliberated for approximately nine hours. Unfortunately, over
 the weekend, Juror C suffered a heart attack and was
 hospitalized.
 
 
          ¶13
 On Monday morning, the court spoke with Juror C's
 daughter and learned that Juror C was "not going to be
 able to, at any time in the reasonable future, be part of
 this jury." Accordingly, Juror C was discharged without
 objection.
 
 
          ¶14
 Given the circumstances, the court presented three options to
 the parties: (1) declare a mistrial; (2) replace Juror C with
 the alternate juror and start deliberations anew; or (3)
 proceed with the eleven remaining regular jurors if both
 parties agreed. The defense declined to stipulate to an
 eleven-person jury, and the court wanted to avoid a mistrial,
 if possible. So, the court decided to pursue option two and
 brought the eleven remaining regular jurors into the
 courtroom to inquire whether they thought it would be
 possible to restart their deliberations with the alternate
 juror. After explaining that this would require them to tear
 up or erase any notes made during deliberations thus far and
 to "[s]tart completely over," the court directed
 them to return to the deliberations room to discuss whether
 "it would be impossible for [them] to not consider in
 any verdict the deliberations that [they'd] already
 had." The court further elaborated that the decision did
 not have to be unanimous, but that it wanted "to know
 whether any of [the jurors]
 
 10
 
 ha[d] hesitations about whether [they could] do this or not
 after talking with each other."
 
 
          ¶15
 The jury returned to the deliberations room and after
 approximately half an hour sent out the following note:
 
 
 We were unanimous on the first count as of Friday, end of
 day. In fact, wanted an extra hour on Friday, because we
 believed we could decide the second [count].
 
 
 If the question is whether we can approach new deliberations
 w/ an open mind, because the alternate will be
 bringing new perspective, yes, we believe it's
 feasible.
 
 
 If the question is whether we can enter new deliberations in
 the same state of mind as Thursday, no, we
 can't undo all the conversations/learning from prior
 deliberations.
 
 
 That being said, we'd like to complete our service w/ the
 alternate + see this case through to the end.
 
 
          ¶16
 After discussing the note and some case law with the parties,
 the court concluded that under Carrillo there is a
 presumption of prejudice to the defendant when a regular
 juror is replaced with an alternate juror in the middle of
 deliberations. But the court found the jury's note
 mitigated any presumed prejudice:
 
 
 But in my judgment we've gotten a note from this jury
 that overcomes every dimension of that prejudice that you can
 imagine. They said —and they are being very nuanced
 about this —they said in the third paragraph, If the
 question is can we pretend like we never heard any of the
 earlier deliberations? The answer is of course we can't.
 
 
 But they're saying in the second paragraph, if the
 question is can we start deliberations anew with an open
 mind? Meaning, that we'll
 
 11
 
 listen to anything new that [Juror W] wants to contribute,
 then the answer to that is yes.
 
 
 And then in the fourth paragraph they are begging to
 continue.
 
 
          ¶17
 Having assured itself that the eleven remaining regular
 jurors could begin deliberations anew, the court next
 questioned the alternate juror to determine whether she had
 followed the instructions it gave her immediately before
 recessing her. Juror W responded in the affirmative. She also
 attested that she was willing to rejoin the jury and that she
 could think of no reason why she should not participate in
 deliberations. Finally, the court asked Juror W to promise
 that if during the deliberations one of the jurors said,
 "Oh, we've already decided that, remember?,"
 Juror W would "speak up and say, 'No, you
 haven't; remember the judge told us to start
 over.'" Juror W obliged. This exchange between the
 court and Juror W took place outside the presence of the
 eleven remaining regular jurors.
 
 
          ¶18
 In light of Juror W's assurances, the court brought back
 into the courtroom the eleven remaining regular jurors and
 instructed the reconstituted jury:
 
 
 You are to begin your deliberations anew. And I want to talk
 for a minute about what that means. It doesn't mean that
 you have to pretend you haven't been spending—that
 you didn't spend all of Friday talking with each other
 and with somebody else, [the juror who had a heart attack],
 and not with [Juror W] about this case. Obviously, you've
 done that. That's happened.
 
 
 But . . . you have to begin your deliberations anew. Which
 means you cannot say, "Oh, remember, we've already
 worked through that. We
 
 12
 
 have already all decided that this element of that charge has
 or has not been proven beyond a reasonable doubt."
 
 
 You have to start over. You have to be open. And you
 indicated in your [note] that you would be open to this new
 point of view that [Juror W] may bring. But it was not just a
 new point of view. It's that now that she's in the
 jury and available to give you that new point of view, you
 have to start over. You have to start over with each element
 of each count.
 
 
 And my staff will bring you new verdict forms back in case
 you filled out your verdict forms in part already. We'll
 bring you a new set of blank ones, verdict forms.
 
 
 You've elected a foreperson. I want you to start over and
 discuss who the foreperson should be. You should talk about
 that again.
 
 
 I want [you] to erase any notes, if you've made any
 notes.... If you've written any notes on the whiteboard,
 please erase those as you go in.
 
 
 If you've made separate notes . . . during deliberations,
 separately, I want you to destroy those notes. Again,
 that's to help you—I don't want you to go back
 saying, "Oh, wait, remember we talked about this element
 and we've already decided all that." You're
 starting everything anew.
 
 
          ¶19
 The reconstituted jury was dismissed to recommence
 deliberations. But, immediately after the jury exited,
 Castro's counsel informed the court that he believed the
 case law required individual questioning of the
 eleven remaining regular jurors about whether they could
 begin deliberations anew. The court recalled those jurors and
 questioned each separately. All eleven confirmed without
 hesitation that they were willing and able to start
 deliberations anew. One juror even responded, "I
 actually look forward to having the opportunity to go through
 it again with a new perspective, because it is so serious, I
 want to make
 
 13
 
 sure we're doing our due diligence." Satisfied with
 each individual juror's affirmations, the court again
 instructed the reconstituted jury to begin deliberations
 anew.
 
 
          ¶20
 At that time, Castro made a motion for a mistrial, which the
 trial court denied. The jury then deliberated for
 approximately five and a half hours before returning guilty
 verdicts on both counts.
 
 
          ¶21
 Castro appealed his conviction. He argued that the trial
 court violated his right to a fair trial by an impartial jury
 when it replaced a regular juror with an alternate juror in
 the midst of deliberations. According to Castro, there could
 be no assurance of a just verdict when Juror W was allowed to
 intrude upon the deliberative process. In his view, such
 interference with the jury's deliberations raised a
 presumption of prejudice to his right to a fair trial, and
 the trial court's procedural precautions were
 insufficient under Burnette and Carrillo to
 overcome that presumption.
 
 
          ¶22
 The People countered that (1) the trial court enjoyed
 discretion under section 16-10-105 to replace a regular juror
 with an alternate juror during deliberations; (2) the
 principles and precautions identified in Burnette
 and Carrillo guided the exercise of that discretion;
 and (3) to the extent the court erred due to an abuse of
 discretion, harmless error was the governing standard of
 reversal
 
 14
 
 pursuant to James.[5] In the alternative, the People
 asserted that, if the statute prohibited the
 mid-deliberations substitution of a regular juror with an
 alternate juror, the only question on appeal was whether
 reversal was warranted, and here it wasn't because the
 error was harmless. Thus, under either position, the People
 nudged the court to use the outcome-determinative standard of
 reversal our court applied in James .[6]
 
 
          ¶23
 A division of the court of appeals unanimously affirmed in an
 unpublished opinion. The division first concluded that it did
 not need to pass judgment on the appropriate standard of
 review because it found no error under either the de novo
 standard urged by Castro or the abuse-of-discretion standard
 championed by the People. Castro, ¶ 18. It then
 turned to Burnette and Carrillo,
 acknowledging that both supported the proposition that
 mid-deliberations juror substitution "raises a
 presumption of prejudice to the defendant's right to a
 fair trial, [which] may be overcome" by adequate
 procedural precautions. Castro, ¶ 19
 (alteration in original) (quoting Burnette, 775 P.2d
 at 588); see also Carrillo, 974 P.2d at 488.
 
 15
 
          ¶24
 But the division hastened to add that both the Supreme Court
 and our court have declined to apply the
 presumption-of-prejudice standard to determine whether
 reversal is warranted in the related factual situation in
 which an alternate juror is permitted to be present as a
 thirteenth juror during deliberations. Castro,
 ¶¶ 20-22 (first citing United States v.
 Olano, 507 U.S. 725, 737-39 (1993); and then citing
 James, ¶ 19, 426 P.3d at 341). The division
 noted that the Supreme Court in Olano held that the
 mere presence of alternate jurors as extra jurors during
 deliberations should not be presumed prejudicial and should,
 instead, be subject to an outcome-determinative standard of
 reversal. Id. at ¶ 21 (citing Olano,
 507 U.S. at 737-39). Continuing, the division pointed out
 that our court has likewise declined to presume prejudice and
 has applied an outcome-determinative standard of reversal to
 the presence (and brief participation) of an alternate juror
 as a thirteenth juror during the very beginning of
 deliberations.[7] Id. at ¶¶ 20-22 (citing
 James, ¶ 19, 426 P.3d at 341).
 
 
          ¶25
 And, explained the division, both Olano and
 James reflect recent changes in the landscape of
 standards of reversal. Id. at ¶ 22.
 Specifically, observed the
 
 16
 
 division, the Supreme Court has developed, and our court has
 accepted, the structural error/trial error dichotomy:
 
 
 [E]rrors in the trial process can require reversal in the
 absence of some determination of their likely impact on the
 outcome of the particular proceedings at issue only if they
 can be categorized as structural error, a limited class of
 errors described by the Court as including errors concerning
 rights protecting some interest other than the
 defendant's interest in not being erroneously convicted;
 errors the effects of which are too hard to measure, in the
 sense of being necessarily unquantifiable and indeterminate;
 and errors that can be said to always result in fundamental
 unfairness.
 
 
 Id. (quoting James, ¶ 15, 426 P.3d at
 339).
 
 
          ¶26
 Rather than resolve whether, post-James, the
 presumption-of-prejudice standard marshaled by
 Burnette and Carrillo continues to apply in
 Colorado to the mid-deliberations replacement of a regular
 juror with an alternate juror, the division assumed, as
 Castro contended, that it does. Id. at ¶¶
 22-23 (quoting James, ¶ 20, 426 P.3d at 341).
 Accordingly, the division applied the lessons of
 Burnette and Carrillo without deciding
 whether to extend the holding in James to
 mid-deliberations juror substitution.
 
 
          ¶27
 The division then determined that any presumption of
 prejudice caused by the substitution of Juror C with Juror W
 "was adequately rebutted by the trial court's
 precautions coupled with the other circumstances of this
 case." Id. at ¶ 23. Thus, ruled the
 division, the trial court had not erred in making this
 substitution. Id. at ¶ 29.
 
 17
 
          ¶28
 Castro now asks us to (1) resolve the standard of review for
 a trial court's mid-deliberations substitution of a
 regular juror with an alternate juror; and (2) address
 whether the division erred by applying the
 presumption-of-prejudice standard of reversal, rather than
 the constitutional harmless error standard of reversal.
 
 
          II.
 Analysis
 
 
          A.
 Authority to Replace a Regular Juror with an Alternate Juror
 After Deliberations Have Begun
 
 
          ¶29
 Whether a trial court may replace a regular juror with an
 alternate juror after deliberations have begun is
 "necessarily predicated" on whether the trial court
 has discretion to require an alternate to remain available
 after the jury has retired to deliberate. Carrillo,
 974 P.2d at 488. Two legal sources—a rule and a
 statute—guide trial courts with regard to the discharge
 of jurors. See Crim. P. 24(e); § 16-10-105.
 
 
          ¶30
 Colorado Rule of Criminal Procedure 24(e) instructs courts
 not to discharge the alternate "until the jury renders
 its verdict or until such time as determined by the
 court." (Emphasis added.) Such language gives
 courts the authority to retain alternate jurors and call on
 them, if necessary, to replace regular jurors during
 deliberations.
 
 
          ¶31
 But the language of the statute is no paragon of clarity,
 raising questions about whether it affords the same
 authority. Section 16-10-105 states,
 
 18
 
 The court may direct that a sufficient number of jurors in
 addition to the regular jury be called and impaneled to sit
 as alternate jurors. Alternate jurors in the order in which
 they are called shall replace jurors who, prior to the
 time the jury retires to consider its verdict, become unable
 or disqualified to perform their duties. Alternate
 jurors shall be drawn in the same manner, shall have the same
 qualifications, shall be subject to the same examination and
 challenges, shall take the same oath, and shall have the same
 functions, powers, facilities, and privileges as the regular
 jurors. An alternate juror shall be discharged when the
 jury retires to consider its verdict or at such time as
 determined by the court.
 
 
 (Emphases added.)
 
 
          ¶32
 The parties disagree over whether the rule or the statute
 controls. In Carrillo, however, we stated that the
 timing of discharging alternates "is a matter of
 substance and not merely a matter of court procedure, [and
 thus] we look to the statute, which controls." 974 P.2d
 at 488. We conform to that holding today and accordingly turn
 our focus to the statute.
 
 
          ¶33
 The paramount rule of statutory interpretation is to
 effectuate the legislature's intent by giving the
 language of the statute its plain and ordinary meaning.
 People v. Weeks, 2021 CO 75, ¶ 25, 498 P.3d
 142, 151. Appellate courts must read a statute as a whole,
 aiming to give consistent, harmonious, and sensible effect to
 all of its parts. Whitaker v. People, 48 P.3d 555,
 558 (Colo. 2002).
 
 
          ¶34
 Section 16-10-105 defies such straightforward construction.
 While the plain language of the second sentence suggests that
 a trial court may substitute regular jurors with alternate
 jurors only prior to deliberations, the plain language of the
 fourth sentence implies just the opposite—that trial
 courts have the discretion "to
 
 19
 
 substitute alternates at a later stage of the proceedings,
 including once deliberations have started."
 Carrillo, 974 P.2d at 489. Thus, we find the statute
 ambiguous on the question of a trial court's authority to
 replace a regular juror with an alternate juror during
 deliberations. Id.; see also Elder v.
 Williams, 2020 CO 88, ¶ 18, 477 P.3d 694, 698
 ("A statute is ambiguous when it is reasonably
 susceptible of multiple interpretations.").
 
 
          ¶35
 But this is hardly breaking news. We reached the same
 conclusion in Carrillo in 1999, a quarter of a
 century ago, and the legislature hasn't deemed fit to
 clarify the internal inconsistency in the statute. So, as in
 1999, we are stuck with the ambiguity.
 
 
          ¶36
 Of course, when, as here, the plain language of a statute
 contains a latent ambiguity, this court may determine the
 intent of the General Assembly by considering the
 statute's legislative history. Rowe v. People,
 856 P.2d 486, 489 (Colo. 1993). Here, however, such history
 only muddies the waters further, so it is of no help to us.
 If this sounds a bit like a broken record, it should:
 We've sung this tune before—in Carrillo.
 See 974 P.2d at 489. But the lyrics we belted out in
 Carrillo have gone as unnoticed as the thud of a
 tree falling in the forest when nobody is around to hear it.
 
 20
 
          ¶37
 A look at the statutory history is helpful in understanding
 the genesis of the ambiguity we've been saddled with for
 more than thirty years.[8] While the statute's second sentence
 has remained intact over the years, the statute's fourth
 sentence has weathered two changings of the tide.
 Id. We thus turn our attention to the fourth
 sentence.
 
 
          ¶38
 Before 1990, the fourth sentence required that an alternate
 juror be discharged at the time the jury retires to consider
 its verdict. § 16-10-105,8A C.R.S. (1986). Then, in
 1990, swept in by a wave of response to two mistrials caused
 by the incapacitation of jurors in the midst of
 deliberations, our General Assembly amended the fourth
 sentence. Carrillo, 974 P.2d at 489. Under the 1990
 amendment, an alternate juror could not be discharged
 "until the jury render [ed] its verdict or until such
 time as determined by the court." Ch. 117, sec. 5,
 § 16-10-105,1990 Colo. Sess. Laws 923, 924.
 
 21
 
          ¶39
 The 1990 amendment, however, created a different problem
 —many trial courts could not properly sequester
 alternate jurors throughout the deliberations.[9]
 Carrillo, 974 P.2d at 489. Believing that the
 pendulum had swung too far the other way, the legislature
 reacted the following year (in 1991), and the tide changed
 again, this time flowing back out in an apparent attempt to
 return things to the way they were prior to the 1990
 amendment. Id. But while the operative language of
 the 1991 amendment revived the pre-1990 rigid requirement
 that an alternate juror "be discharged when the jury
 retires to consider its verdict," it also added the
 equivocal phrase "or at such time as determined by the
 court." Ch. 80, sec. 6, § 16-10-105, 1991 Colo.
 Sess. Laws 428, 429-30; see also § 16-10-105,
 C.R.S. (2023). With these flummoxing edits, ambiguity was
 sown, and that ambiguity continues to blossom in 2024.
 
 
          ¶40
 Not surprisingly, divisions of the court of appeals have
 disagreed over whether the 1991 amendment gives trial courts
 the discretion to delay the discharge of an alternate juror
 once deliberations commence. Compare People v.
 Montoya, 942 P.2d 1287, 1295 (Colo.App. 1996)
 (explaining that, like the pre-1990
 
 22
 
 statute, the 1991 amendment requires trial courts to dismiss
 alternate jurors at the start of deliberations), with
 People v. Carrillo, 946 P.2d 544, 549 (Colo.App. 1997)
 (concluding that the 1991 amendment returned things to their
 pre-1990 state "with one important addition: [t]he trial
 court in its discretion may dismiss the alternate at a
 different time" than when the jury retires to
 deliberate), affd on other grounds, 974 P.2d at 480.
 This court, however, has determined it unnecessary to crack
 this conundrum because, regardless of the answer, a
 mid-deliberations juror substitution "raises a
 presumption of prejudice to the defendant's right to a
 fair trial." Carrillo, 974 P.2d at 490.
 
 
          ¶41
 Today, we stick to the course chartered by Carrillo.
 Thus, we echo what we said there: Whether statutory authority
 for mid-deliberations juror substitutions exists or not, the
 presumption of prejudice to the defendant's right to a
 fair trial applies.[10]
 
 
          ¶42
 True, as Castro reminds us, our jurisprudence regarding the
 mid-deliberations presence of an alternate juror as a
 thirteenth juror has progressed since Carrillo,
 see James, ¶¶ 13-15, 426 P.3d at 339-40,
 and we followed Olano, not Carrillo, in
 James. As we demonstrate next, however, that line of
 cases is inapposite.
 
 23
 
 Our case law on the replacement of a regular juror with an
 alternate juror mid-deliberations represents a different and
 distinguishable evolutionary branch.
 
 
          B.
 Evolution of Two Lines of Deliberations Cases: The Presence
 of an Alternate Juror and the Replacement of a Regular Juror
 with an Alternate Juror
 
 
          ¶43
 Our cases addressing the mid-deliberations presence
 of an alternate juror as a thirteenth juror share a common
 ancestor with our cases addressing the mid-deliberations
 substitution of a regular juror with an alternate
 juror. Over time, however, these cases have evolved into two
 distinct lineages. To understand these distinguishable but
 related case species, we must trace their evolution.
 
 
          ¶44
 We begin with the grandfather of both evolutionary branches,
 Boulies, 690 P.2d at 1254-55, which gave birth to
 the presumption-of-prejudice analysis. There, the trial judge
 gave the alternate juror permission to "go in and
 listen" to the deliberations so long as she remained
 silent and did not vote. Id. at 1255. Following the
 jury's guilty verdicts and an unsuccessful direct appeal,
 Boulies sought and received postconviction relief on the
 ground that an unauthorized person (a thirteenth juror) had
 been present in the jury room during deliberations.
 Id. at 1254. The People appealed to our court, and
 we vacated the postconviction order and remanded the case for
 an evidentiary hearing to determine whether the alternate
 juror had actually retired with the regular jurors to
 deliberate. Id. at 1255.
 
 24
 
          ¶45
 Because Boulies involved an issue of first
 impression, we took the opportunity to clarify that the
 presence of a thirteenth juror during deliberations violates
 both "the cardinal principle that the deliberations of
 the jury shall remain private and secret in every case,"
 id. at 1256 (quoting United States v. Va.
 Erection Corp., 335 F.2d 868, 872 (4th Cir. 1964)), and
 the "fundamental right to a jury trial free from the
 intrusion of non-jurors," id. We didn't
 stop there; of particular interest here, we went on to reject
 the People's position that, even assuming the alternate
 was present during deliberations, Boulies was required to
 establish "that the alternate had some effect on those
 deliberations." Id. at 1255. Instead, we
 articulated the principle that became the very DNA of these
 deliberations cases: "[W]e view the presence of an
 alternate juror during the jury's deliberations as
 sufficiently impinging upon the defendant's
 constitutional right to a jury trial to create a
 presumption of prejudice that, if not rebutted, requires
 reversal." Id. at 1255-56 (emphasis added). To
 rebut the presumption, we said, a party must produce
 evidence establishing that the error was harmless beyond a
 reasonable doubt. Id. at 1256 n.5.
 
 
          ¶46
 Our case law took its next evolutionary step with
 Burnette, which extended the
 presumption-of-prejudice analysis to situations in which a
 regular juror is replaced with an alternate juror in the
 middle of deliberations. 775 P.2d at 590. In that case, the
 jury deliberated for four and a half hours and then recessed
 for the
 
 25
 
 day. Id. at 585. A severe snowstorm moved in
 overnight and snowed in one of the regular jurors, which
 prompted the court to recall the alternate juror.
 Id. The reconstituted jury found Burnette guilty,
 but a division of the court of appeals reversed based on the
 trial court's failure to take adequate precautionary
 steps to guard against prejudice to Burnette as a result of
 the juror substitution. Id. at 584. We agreed with
 the division and affirmed. Id. at 585. Perhaps most
 notably, we laid out a set of principles that began to fill
 in the distinct phenotype of mid-deliberations
 juror-substitution cases.
 
 
          ¶47
 Recognizing that the mid-deliberations substitution of a
 regular juror with an alternate juror implicates unique
 sources of potential prejudice, our court voiced concern for
 the "real danger" that the alternate juror (1)
 "will not have a realistic opportunity to express his
 views and to persuade others"; (2) "will not have
 been part of the dynamics of the prior deliberations";
 and (3) will not "have had the benefit of the
 unavailable juror's views." Id. at 588. In
 addition, we worried that "a lone juror who cannot in
 good conscience vote for conviction might be under great
 pressure to feign illness in order to place the burden of
 decision on an alternate." Id. Borrowing from
 cases involving the mid-deliberations presence of an
 alternate juror as a thirteenth juror, we determined that
 these risks warranted a presumption of prejudice.
 Id. at 590. But we concluded that in the context of
 the mid-deliberations substitution of a regular
 
 26
 
 juror with an alternate juror, such a presumption could be
 overcome only if the trial court took "extraordinary
 precautions" to ensure a defendant would not be
 prejudiced and if those precautions achieved the intended
 result.[11] Id.
 
 
          ¶48
 Four years after we decided Burnette, the Supreme
 Court dealt with a case involving the "mere
 presence" of alternate jurors as extra jurors during
 deliberations. Olano, 507 U.S. at 740-41. And while
 Olano is obviously not an offspring of
 Boulies, we discuss it here because it impacted one
 of the two evolutionary branches that sprouted from
 Boulies.
 
 
          ¶49
 The trial court in Olano allowed two alternate
 jurors to attend deliberations so long as they did not
 participate. Id. at 729. As our court had done in
 Boulies, the Supreme Court in Olano
 acknowledged that the presence of alternate jurors during
 deliberations contravenes "the cardinal principle"
 that deliberations "remain private and secret."
 Olano, 507 U.S. at 737 (quoting Fed. R. Crim. P.
 23(b) advisory committee's note to 1983 amendments);
 accord Boulies, 690 P.2d at 1256. But the
 Olano Court emphasized that the "primary"
 purpose of this principle "is
 
 27
 
 to protect the jury's deliberations from improper
 influence." 507 U.S. at 737-38. And because the trial
 court there had instructed the alternates not to participate
 in deliberations, an instruction the law assumed they
 followed, the Supreme Court declined to presume prejudice to
 Olano and his codefendant. Id. at 740. Under these
 circumstances, the Court reasoned that the mere presence of
 the alternates did not taint the deliberations with outside
 influence. Id. at 739 (noting the alternates'
 presence was substantively similar to "the presence in
 the juryroom of an unexamined book"). Thus, rather than
 apply the presumption-of-prejudice standard of reversal, the
 Court applied the outcome-determinative standard of reversal
 governing unpreserved errors (plain error). Id. at
 741.
 
 
          ¶50
 Importantly, though, the Court in Olano cautioned
 that the presence of an alternate during deliberations may
 prejudice the defendant in some circumstances. Id.
 at 739. More specifically, the Court identified two ways in
 which such prejudice might occur: (1) if the alternate
 "actually participate[s] in the deliberations, verbally
 or through 'body language'"; and (2) if the
 alternate's "presence exert[s] a 'chilling'
 effect on the regular jurors." Id.
 
 
          ¶51
 Mindful of Olano, we circle back now to the two
 evolutionary branches that grew from
 Boulies—specifically, the tips of those
 branches (the youngest descendants of Boulies).
 Since Olano, our court has decided two cases of key
 import—one involving the mid-deliberations substitution
 of a regular juror with
 
 28
 
 an alternate juror, and the other involving the
 mid-deliberations presence of an alternate juror as a
 thirteenth juror. See Carrillo, 974 P.2d at 488;
 James, ¶ 5, 426 P.3d at 337. These two case
 types applied different standards of reversal. A close
 inspection of Carrillo and James highlights
 the utility of their dual methodologies — each
 applicable in a different factual context.
 
 
          ¶52
 The jury in Carrillo deliberated for a little over
 four hours and then returned guilty verdicts on all the
 charges brought against Carrillo and his codefendant. 974
 P.2d at 488. But as the trial court polled the jurors
 individually, one juror said that he found Carrillo not
 guilty of one of the charges. Id. Because one of the
 verdicts was not unanimous, the court ordered the jury to
 return to the deliberations room and reconsider all the
 verdicts. Id. at 482-83. Within an hour, the jury
 sent the court a note indicating that it had "come to
 believe" that the holdout juror "did not hear all
 of the testimony, does not fully understand all of the
 charges and instructions, and did not hear some discussion in
 deliberations."[12]Id. at 483. Under these
 circumstances, observed the jury, it did not believe it could
 render a unanimous verdict. Id. Over Carrillo's
 and his codefendant's objections, the court replaced the
 holdout juror with an alternate juror. Id. at 483.
 The
 
 29
 
 reconstituted jury then deliberated for more than six hours
 and returned unanimous guilty verdicts on all the charges.
 Id. at 484.
 
 
          ¶53
 On review, our court cautioned that the case raised the
 "specter" of the dangers first warned of in
 Burnette. Id. at 491. For one, there was
 the risk that a lone juror might feign illness to be relieved
 of any decision-making responsibility. Id. There was
 also the concern that, following the substitution of the
 holdout juror, the eleven remaining regular jurors would be
 unable to set their previous deliberations aside and start
 deliberating anew. Id. at 491-92. And there was the
 peril that the dismissal of the holdout juror might be
 misinterpreted as indicative of the court's views on the
 merits of the case—i.e., that the court believed the
 holdout juror had reached the wrong result. Id. at
 491. We reiterated what we said in Burnette: In
 situations in which an alternate juror replaces a regular
 juror during deliberations, the presumption of prejudice may
 be rebutted only under unusual circumstances. Id. at
 492.
 
 
          ¶54
 Elaborating, we declared that adherence to the
 Burnette precautions provides the requisite
 protection to overcome the presumption of prejudice.
 Id. And, chaperoned by Burnette, we found
 that the presumption had been rebutted there by the trial
 court's diligence in (1) informing the alternate juror at
 the end of the trial that she was not discharged and was
 still subject to the court's admonitions; (2) confirming
 that the alternate juror had continued to heed the
 
 30
 
 court's admonitions between the time she was recessed and
 the time she was called back; (3) instructing the eleven
 remaining regular jurors to put their previous deliberations
 out of their minds and begin deliberating anew; and (4)
 receiving individual assurances from those eleven jurors that
 they could do so. Id. Furthermore, the evident
 nature of the holdout juror's hearing impairment, which
 he had disclosed from the start, allowed this court to feel
 confident that the problem was not manufactured. Id.
 Lastly, the reconstituted jury deliberated for two hours
 longer than the original jury; surrendered the notes from the
 first round of deliberations before the second round of
 deliberations; and submitted a question that demonstrated it
 was analyzing the evidence and the law afresh. Id.
 at 492-93. Together, these circumstances persuaded us that
 the reconstituted jury had indeed deliberated anew.
 Id. at 493.
 
 
          ¶55
 Tellingly, Olano and its outcome-determinative
 standard of reversal did not factor into our decision in
 Carrillo. See Carrillo, 974 P.2d at 491.
 Instead, in discerning whether reversal was warranted, we
 applied the presumption-of-prejudice standard from
 Burnette. So, today, we simply make explicit what
 was already implicit in Carrillo: The
 presumption-of-prejudice standard of reversal continues to
 apply in Colorado in mid-deliberations juror-substitution
 cases after Olano.
 
 31
 
          ¶56
 But what do we make of our most recent opinion of relevance,
 James, where we looked to Olano, not
 Burnette and Carrillo, for guidance, and we
 accordingly applied an outcome-determinative standard of
 reversal, not the presumption-of-prejudice standard of
 reversal? Differently propounded, how do we square
 James, an Olano apostle, with
 Burnette, Carrillo, and today's
 decision? The answer is that Olano and
 James are "apples," whereas
 Burnette, Carrillo, and this case are
 "oranges." Recall that Olano and
 James both involved the presence of alternate jurors
 as extra jurors during deliberations, not the
 mid-deliberations substitution of regular jurors with
 alternate jurors.
 
 
          ¶57
 Olano itself explained that an alternate's
 mere presence in deliberations, without more, is not
 enough to support a presumption of prejudice, but an
 alternate's participation in deliberations is an
 altogether different beast that may well justify the
 presumption. 507 U.S. at 739 (acknowledging that
 "[t]here may be cases where an intrusion should be
 presumed prejudicial" and explaining that "the
 presence of alternate jurors during jury deliberations might
 prejudice a defendant . . . because the alternates actually
 participated in the deliberations, verbally or through
 'body language'" (citing United States v.
 Allison, 481 F.2d 468, 472 (5th Cir. 1973))). With
 extra jurors, participation is merely a
 possibility; with substituted jurors, by
 contrast, it is the expectation. To presume
 prejudice in the latter but not the former is not a
 contradiction—far from it, it is a recognition that
 
 32
 
 inherent in each situation are differing levels of threat to
 the defendant's right to a fair trial.
 
 
          ¶58
 We realize that, unlike the alternate jurors in
 Olano, the alternate juror in James
 actually participated in the deliberations. But, as Castro
 concedes, that doesn't render James apposite.
 For in James, the extra juror did not deliberate on
 the verdict. Rather, his presence and participation in the
 deliberations was minimal—he was removed from the jury
 room after the first ten minutes of deliberations, and not
 much occurred during those ten minutes: the jury selected the
 alternate juror as the foreperson, took a preliminary vote to
 get a sense of what the group thought, and began discussing
 the elements of the charges. James, ¶¶
 1-2, 5, 426 P.3d at 336-37. And to our point, such minimally
 invasive participation is only possible in
 extra-juror situations. Hence, while James
 technically involved the participation (as opposed to the
 mere presence) of an alternate juror during deliberations, it
 is of the extra-juror ilk, not of the substituted-juror ilk.
 
 
          ¶59
 Based on the factual situation we confronted in
 James, we were understandably inclined to rely on
 Olano. Id. at ¶¶ 6, 13, 426 P.3d
 at 337, 339. Indeed, our approach there was influenced by (1)
 Olano's refusal to presume prejudice from an
 alternate's mere presence during deliberations, and (2)
 our endorsement of the Supreme Court's refined
 jurisprudence on the nature and
 
 33
 
 effect of errors committed in the trial process (i.e., the
 structural error/trial error dichotomy). Id. at
 ¶¶ 13,15, 426 P.3d at 339-40.
 
 
          ¶60
 Following Olano, James applied an
 outcome-determinative standard of reversal (harmless error),
 scrutinizing whether there was a reasonable possibility that
 the erroneous presence of the alternate during deliberations
 "would have adversely affected the verdict of a typical
 jury." ¶ 20, 426 P.3d at 341. Considering the
 limited intrusion of the alternate and the overwhelming
 evidence supporting the conviction, we had little difficulty
 concluding that the alternate's presence was harmless,
 regardless of whether it was viewed as a constitutional or
 nonconstitutional error.[13] Id. at ¶¶ 19, 21,
 426 P.3d at 341.
 
 
          ¶61
 Seizing on a sentence from our opinion in James,
 Castro contends that we have explicitly drawn into question
 the authoritativeness of our line of cases on the
 mid-deliberations substitution of a regular juror with an
 alternate juror (i.e.,
 
 34
 
 Burnette and its offspring). Id. at ¶
 20, 426 P.3d at 341. But this argument cannot take Castro
 far. In James, we didn't address whether
 Burnette and its descendants remained authoritative.
 We simply said that, "[w]hatever may be the
 continued vitality of our juror-substitution line of
 cases . . ., we [did] not understand the considerations
 expressed in those cases to govern the harmlessness of an
 'intrusion' by an alternate upon the deliberations of
 a properly constituted jury." Id. (emphasis
 added). Our point was that, regardless of whether our
 mid-deliberations juror-substitution cases retained validity
 (an issue that was not before us), the concerns that
 motivated those decisions didn't control in
 James because James involved an extra-juror
 situation, not a substituted-juror situation. ¶62 As we
 make clear today, however, our mid-deliberations
 juror-substitution line of cases is alive and kicking after
 James. Accordingly, while James adhered to
 Olano (apples to apples), we lean on
 Burnette and Carrillo (oranges to oranges).
 
 
          ¶63
 In short, although the presumption-of-prejudice standard has
 been supplanted by an appropriate outcome-determinative
 standard in extra-juror cases, it has not been banished to
 extinction. No, it continues to have application in cases
 involving the mid-deliberations substitution of regular
 jurors with alternate jurors. And any contention that it is
 improper to use the presumption-of-prejudice standard in this
 factual scenario without first finding (or at least assuming)
 error—because it's a standard of reversal—is
 an attempt to board the
 
 35
 
 ship that set sail when we decided Carrillo in 1999.
 The Carrillo court used this standard of reversal
 without first finding or assuming there was error. It
 reasoned that, irrespective of whether there was
 error, a rebuttable presumption of prejudice was
 warranted with respect to Carrillo's right to a fair
 trial.
 
 
          ¶64
 We discuss next why we hold on to the remaining vestiges of
 the presumption-of-prejudice standard in mid-deliberations
 juror-substitution cases.
 
 
          C.
 The Presumption-of-Prejudice Standard Serves a Necessary
 Function in Mid-Deliberations Juror-Substitution
 Cases
 
 
          ¶65
 "Form follows function." First coined in the
 architectural context, then embraced as a biological
 principle, this concept is useful in demonstrating that the
 applicable standard of reversal must follow the function to
 be served.
 
 
          ¶66
 The primary concern in felony cases involving either an extra
 juror or a substituted juror during deliberations is ensuring
 the defendant's right to a fair trial. See
 Olano, 507 U.S. at 737-38; Colo. Const. art. II, §
 23. In the former, this threat comes from the presence and
 potential participation of a thirteenth juror, but in the
 latter, this threat can come either from the lingering
 influence of the dismissed juror or from outside information
 the alternate has learned since the trial's conclusion.
 Moreover, juror-substitution cases face the additional threat
 that the alternate juror may not have "a realistic
 opportunity to express his views and to persuade
 others," making the jury, at least in practice, a jury
 of eleven.
 
 36
 
 Burnette, 775 P.2d at 588. To avoid reversal, there
 must be assurances that the deliberations do not fall prey to
 one of these dangers. The function of the standard of
 reversal is to ascertain whether such assurances exist. And
 the form of the presumption-of-prejudice standard is best
 suited to serve that function in mid-deliberations
 juror-substitution cases.
 
 
          ¶67
 For starters, as its moniker suggests, the constitutional
 harmless error standard proposed by Castro requires error. In
 cases of a thirteenth juror, that standard fits like a glove:
 It is obviously error to permit an alternate to attend
 deliberations as a thirteenth juror. But in cases of a
 substituted juror, the answer is not so clear. As we
 explained earlier, given the ambiguity in section 16-10-105,
 we cannot say whether it is error to substitute a regular
 juror with an alternate juror mid-deliberations. So, why
 would we use a standard of reversal that applies to
 errors? In our view, it is more logical to presume
 prejudice to the defendant's right to a fair trial, and
 to then hinge our decision to affirm or reverse on whether
 that presumption is overcome by the precautionary measures
 taken by the court.
 
 
          ¶68
 Castro nevertheless insists that, although functionally
 similar to the presumption-of-prejudice standard, the
 constitutional harmless error standard would be more
 protective of the jury's deliberative process.
 Interestingly, though, he admits that the analysis he
 advances would consider the same factors that are relevant
 under the presumption-of-prejudice standard.
 
 37
 
          ¶69
 But if the same factors are pertinent to both standards, then
 the principal difference in the analysis is that, rather than
 presuming prejudice and inquiring whether the procedures
 effectuated by the trial court suffice to rebut that
 presumption, constitutional harmlessness begins with the
 assumption that the trial court committed an error and that
 the People must bear the burden of proving beyond a
 reasonable doubt that the error was harmless. See Hagos
 v. People, 2012 CO 63, ¶ 11, 288 P.3d 116, 119.
 This would unfairly put the People behind the eight ball: Why
 should the People be required to prove the harmlessness of an
 error beyond a reasonable doubt when we don't even know
 if there was an error in the first place?
 
 
          ¶70
 Moreover, unlike the harmlessness standard, the
 presumption-of-prejudice standard allows us to balance our
 duty to ensure a fair trial with the significant interest in
 avoiding a mistrial. Reversing a conviction "entails
 substantial social costs." People v. Casias,
 2012 COA 117, ¶ 56, 312 P.3d 208, 219 (quoting
 United States v. Mechanik, 475 U.S. 66, 72 (1986)).
 "[I]t forces jurors, witnesses, courts, the prosecution,
 and the defendants to expend further time, energy, and other
 resources to repeat a trial that has already once taken
 place; [and] victims may be asked to relive their disturbing
 experiences." Id. (alteration in original). In
 this regard, we are keenly aware that this is a sexual
 assault case and that the victim is a child.
 
 38
 
          ¶71
 Although the foregoing social costs may both be
 "acceptable and ... necessary" to protect a
 defendant's right to a fair trial, id. (omission
 in original) (quoting Mechanik, 475 U.S. at 72),
 employing the prophylactic precautions prescribed in
 Burnette and Carrillo allows us to avoid
 them. This is not possible under the constitutional
 harmlessness standard. Indeed, were we to review for
 constitutional harmless error, it would telegraph to trial
 courts that it is error to replace a regular juror with an
 alternate juror during deliberations, regardless of the
 social costs of declaring a mistrial. Talk about a catch-22:
 Declare a mistrial or intentionally commit
 error.[14]
 
 39
 
          III.
 Application
 
 
          A.
 Standard of Review
 
 
          ¶72
 Castro argues for de novo review based on his position that
 the pertinent question we must answer is whether a trial
 court has statutory authority to substitute a deliberating
 juror. See People v. Kembel, 2023 CO 5, ¶ 24,
 524 P.3d 18, 23 (stating that whether a trial court has
 statutory authority is a question of law that we review de
 novo). The People, by contrast, push for an abuse of
 discretion standard of review.
 
 
          ¶73
 As we've explained, instead of delving into the
 appropriate standard of review to ascertain whether an error
 occurred, we presume that a mid-deliberations substitution of
 a regular juror with an alternate juror always prejudices the
 defendant. It follows that the only relevant inquiry is
 whether reversal is warranted. And that question turns on
 whether the precautions employed by the trial court, when
 considered in light of the surrounding circumstances,
 overcome the presumption of prejudice to the defendant. This
 is the standard of reversal we apply here.
 
 
          ¶74
 In conducting this inquiry, we are mindful that "the
 fact that a trial court has taken extraordinary precautions,
 in and of itself, is insufficient to rebut the presumption of
 prejudice to the defendant's right to a fair trial."
 Carrillo, 974 P.2d at 493. Rather, we must assure
 ourselves that "under the circumstances of the case,
 
 40
 
 the precautions were adequate to achieve that result."
 Id. (quoting Burnette, 775 P.2d at 590).
 Accordingly, we concentrate now on whether the trial
 court's precautions were sufficient to protect
 Castro's right to a fair trial.
 
 
          B.
 The Trial Court's Precautions Successfully Rebutted the
 Presumption
 
 
          ¶75
 The trial court's actions in this case provide a model
 for trial courts to apply the principles and precautions
 outlined in Burnette and Carrillo. And
 because the precautions implemented by the trial court
 successfully rebutted the presumption of prejudice raised by
 the mid-deliberations substitution of Juror C with Juror W,
 we perceive no basis for reversal.
 
 
          ¶76
 To begin, the court took all appropriate precautions with
 respect to Juror W. At the close of trial, after announcing
 that Juror W was the alternate, the court made clear to her
 that it was simply recessing her, not discharging her. The
 court also instructed her that she was not to internally
 deliberate about the case, discuss the case with anyone, or
 view any media coverage of the proceedings, and that she was
 to keep an open mind regarding the case. Once the trial court
 recalled Juror W, it questioned her and confirmed that she
 had adhered to its admonitions. Juror W also attested that
 she was willing and able to participate in the deliberations
 and promised to remind the other jurors that deliberations
 were to begin anew.
 
 41
 
          ¶77
 Next, the court closely followed the requisite precautions
 handed down by Burnette and Carrillo. The
 court explained the situation to the eleven remaining regular
 jurors and then gave them time to reflect on and discuss
 whether they could restart deliberations. Once the court
 received their confirmation that they could do so, it
 thoroughly instructed them about their responsibility to
 begin deliberations anew and to remain open to Juror W's
 point of view. At defense counsel's request, the court
 then questioned those jurors individually to confirm that
 they were willing and able to start deliberations anew. And
 the eleven remaining regular jurors relinquished their notes
 from the first deliberations.
 
 
          ¶78
 Notably, the circumstances here do not present one of the
 major concerns articulated in Burnette and
 Carrillo. It is clear from the record that Juror
 C's health issues were genuine.
 
 
          ¶79
 Castro, however, argues that the prejudice to him is clear
 because the original jury deliberated for approximately nine
 hours, whereas the reconstituted jury deliberated for only
 five and a half hours. And he points out that the original
 jury had admittedly made substantial progress, reaching a
 unanimous decision on one count and stating it needed perhaps
 an hour to reach a decision on the second count. According to
 Castro, after all of this, it is inconceivable the eleven
 remaining regular jurors could simply set aside the
 discussions during the first round of deliberations and
 return to square one.
 
 42
 
          ¶80
 But we agree with the division that five and a half hours is
 still a substantial amount of time to deliberate.
 Castro, ¶ 28. Comparing the time the original
 jury and the reconstituted jury spent in deliberations is
 relevant, see Burnette, 775 P.2d at 590;
 Carrillo, 974 P.2d at 492, but not dispositive.
 We're aware of no authority supporting the proposition
 that shorter second deliberations necessarily signal that the
 reconstituted jury failed to start from scratch. This is
 especially true given that matters like organizing the
 exhibits or deciding on a procedure for selecting the
 foreperson may be more streamlined the second time around.
 Castro, ¶ 28. We decline Castro's
 invitation to engage in any line-drawing over what
 constitutes a sufficient amount of time for a second take at
 deliberations. Nor are we willing to speculate about the
 reconstituted jury's deliberations.
 
 
          ¶81
 As for the progress the original jury made before Juror W was
 called upon to deliberate, we recognized in Carrillo
 that, so long as the appropriate precautions are taken, an
 alternate juror may substitute a regular juror even after the
 jury has completed deliberations and even though the replaced
 juror was a lone holdout. 974 P.2d at 491-92. Here, the
 circumstances were not so extreme. What's more, following
 the first round of deliberations, the eleven remaining
 regular jurors
 
 43
 
 affirmed both in their written note to the trial judge and
 during individual questioning that they were willing and able
 to return to square one.[15]
 
 
          ¶82
 In sum, we conclude that the trial court meticulously
 implemented the precautions outlined in Burnette and
 Carrillo. We further conclude that those precautions
 were sufficient under the circumstances of this case to rebut
 the presumption of prejudice to Castro stemming from the
 mid-deliberations substitution of Juror C with Juror W.
 
 
          IV.
 Conclusion
 
 
          ¶83
 Life happens — including during jury deliberations. It
 is not rare for a juror to unexpectedly become incapacitated
 in the middle of deliberations. The legislature sought to
 address this situation through section 16-10-105. But in its
 1991 amendment of that statute, it contradicted itself. It
 may well be that the legislature has not corrected that
 ambiguity because it agrees with the approach we took in
 Burnette and Carrillo. Even so, it would be
 preferable to have the legislature clarify its intent. So
 long as we are left to guess what that intent is, we have
 little choice but to continue along the path cleared by
 Burnette and Carrillo.
 
 44
 
          ¶84
 For the foregoing reasons, we proclaim the continued vitality
 of the presumption-of-prejudice standard of reversal in our
 mid-deliberations jurorsubstitution cases. And, applying that
 standard, we conclude that Castro was not prejudiced by the
 mid-deliberations substitution of Juror C, a regular juror,
 with Juror W, an alternate juror. Accordingly, we affirm the
 division's judgment.
 
 45
 
          
 JUSTICE GABRIEL, joined by JUSTICE HOOD, concurring in the
 judgment.
 
 
          ¶85
 In purported accordance with our prior decision in
 Carrillo v. People, 974 P.2d 478 (Colo. 1999), the
 majority does not decide whether the mid-deliberation
 substitution of an alternate juror was error (or even assume
 without deciding that an error occurred) and applies a
 presumption of prejudice standard, concluding that the
 presumption of prejudice was overcome here. Maj. op.
 ¶¶ 6-8, 40-41, 67, 70, 83-84.
 
 
          ¶86
 I do not agree that it is appropriate to apply a presumption
 of prejudice standard without at least assuming that an error
 occurred. The presumption of prejudice standard is a standard
 of reversal. Accordingly, it cannot be untethered from a
 determination (or at least an assumption) of error.
 
 
          ¶87
 Moreover, I do not believe that the presumption of prejudice
 standard that the majority employs survived our decision in
 James v. People, 2018 CO 72, 426 P.3d 336.
 
 
          ¶88
 Accordingly, I would assume without deciding that it was
 error to substitute an alternate juror mid-deliberation, and
 I would apply the constitutional harmless error standard that
 we, in James, ¶¶ 20-21, 426 P.3d at 341,
 concluded applies in cases like this one involving alternate
 juror participation in deliberations. Doing so, I would
 conclude that the error here was harmless beyond a reasonable
 doubt.
 
 46
 
          ¶89
 Because I reach the same conclusion as the majority, although
 for different reasons, I concur in the judgment, only.
 
 
          I.
 Factual and Procedural Background
 
 
          ¶90
 The pertinent facts are not disputed.
 
 
          ¶91
 Ricardo Castro was charged with sexual assault on a child
 pursuant to section 18-3-405(1), C.R.S. (2023), and sexual
 assault on a child by one in a position of trust pursuant to
 section 18-3-405.3, C.R.S. (2023), arising out of conduct
 involving his former girlfriend's nine-year-old
 granddaughter. Castro exercised his right to a jury trial,
 and a jury of thirteen was constituted, including Juror C,
 who was a retired bankruptcy judge, and Juror W, whom the
 trial court would later identify as the alternate juror.
 
 
          ¶92
 The case proceeded to a three-day trial, and before the jury
 began deliberations, the court advised Juror W that the court
 was not going to discharge her but rather would
 "recess" her and allow her to return home or to
 work. In doing so, the court instructed Juror W to continue
 to follow all of the admonitions that the court had given
 during the trial: "Don't decide the case. Don't
 discuss the case with any of those curious loved ones or
 friends or family or co-workers. Don't view any media
 coverage of the case, and continue to keep your mind
 open."
 
 
          ¶93
 The twelve remaining jurors began deliberations and discussed
 the case for about forty-five minutes before recessing for
 the evening. The jury reconvened
 
 47
 
 the next day and continued deliberating until the evening,
 when the court recessed for the weekend. At that point, the
 jury had deliberated for approximately nine hours and
 forty-five minutes.
 
 
          ¶94
 Over the weekend, Juror C suffered a heart attack and was
 hospitalized. Based on information provided by Juror C's
 daughter, the court determined that he would not be able to
 continue as part of the jury and discharged him.
 
 
          ¶95
 The court then discussed with the parties three possible
 alternatives, in light of Juror C's circumstances: (1)
 declare a mistrial; (2) continue with a jury of eleven, which
 would require both parties' consent; or (3) substitute
 Juror W for Juror C.
 
 
          ¶96
 Defense counsel declined to stipulate to a jury of fewer than
 twelve members, and the People opposed a mistrial. As a
 result, the court decided to reconstitute the jury with Juror
 W, which the court determined would be proper as long as the
 court took the precautionary measures set forth in our prior
 case law.
 
 
          ¶97
 To that end, the court brought the eleven remaining jurors
 into the courtroom, advised them of Juror C's absence,
 and asked whether they would be able to start deliberations
 anew with Juror W. The court emphasized that this "means
 tear up your notes, all the notes that you've made during
 your deliberations, erase any notes you've made on the
 whiteboard. Start completely over with an alternate.
 That's what the law requires for me to bring the
 alternate
 
 48
 
 back in." Having asked whether the jurors could do this,
 the court allowed them to return to the jury room to discuss
 the matter.
 
 
          ¶98
 The jurors did so, and after approximately thirty minutes,
 they sent the court a note, stating, "We were unanimous
 on the first count as of Friday, end of day. In fact, [we]
 wanted an extra hour on Friday, because we believed we could
 decide the second." The jurors nonetheless said,
 "[W]e believe it's feasible" to start
 deliberations anew with an open mind as to Juror W's
 potentially new perspective. They clarified, however, that
 they could not enter new deliberations in the same state of
 mind as they had before their initial round of deliberations
 because they could not "undo all the
 conversations/learning from prior deliberations." That
 said, they expressed their desire to complete their jury
 service with the alternate and "see this case through to
 the end."
 
 
          ¶99
 In the court's view, although Castro was entitled to a
 presumption of prejudice from the mid-deliberation
 substitution of an alternate juror, the jury's note
 overcame "every dimension of that prejudice that you can
 imagine." The court thus brought Juror W back to the
 courtroom to confirm that she (1) had, in fact, followed all
 of the court's admonitions, including its admonitions not
 to decide the case, not to discuss the case with others, and
 to avoid external influences; and (2) was willing to rejoin
 the jury and begin deliberations. Juror W answered
 affirmatively on both points.
 
 49
 
          ¶100
 Having undertaken the foregoing precautionary measures, the
 court informed the jurors that Juror W would substitute for
 Juror C and instructed them to start deliberations anew,
 stressing, "It doesn't mean that you have to pretend
 you haven't been spending—that you didn't spend
 all of Friday talking with each other and somebody else,
 [Juror C], and not with [Juror W] about this case," but
 "[y]ou have to be open" and "[y]ou have to
 start over with each element of each count." The court
 also informed the jurors that they would have to (1) repeat
 the foreperson election process, (2) destroy any notes from
 their prior deliberations, and (3) use new verdict forms. And
 the court asked Juror W to promise to speak up if any of the
 other jurors was not, in fact, honoring their commitment to
 start over.
 
 
          ¶101
 The court then instructed the reconstituted jury to begin its
 deliberations, but on defense counsel's further request,
 the court opted to speak with each of the eleven original
 jurors individually, to confirm that they were willing to
 begin deliberations anew. All eleven said that they were.
 
 
          ¶102
 The reconstituted jury then began deliberations, and after
 approximately five and one-half hours, the jury returned a
 guilty verdict on both counts.
 
 
          ¶103
 Castro subsequently appealed, arguing, as pertinent here,
 that the trial court had reversibly erred by substituting
 Juror W for Juror C. A division of our court of appeals
 affirmed, however, assuming without deciding that the
 presumption of
 
 50
 
 prejudice standard had survived James and
 determining that the precautions taken by the trial court,
 coupled with the other circumstances of the case, overcame
 any presumption of prejudice. People v. Castro, No.
 18CA2389, ¶¶ 23, 54 (Aug. 11, 2022).
 
 
          II.
 Analysis
 
 
          ¶104
 I begin by discussing the alternate juror statute and rule. I
 then assume without deciding that it was error to substitute
 the alternate juror mid-deliberation, and I proceed to
 discuss what I believe to be the proper standard of reversal
 and to apply that standard to the facts before us.
 
 
          A.
 Section 16-10-105 and Crim. P. 24(e)
 
 
          ¶105
 Section 16-10-105, C.R.S. (2023), provides, in pertinent
 part:
 
 
 Alternate jurors in the order in which they are called shall
 replace jurors who, prior to the time the jury retires to
 consider its verdict, become unable or disqualified to
 perform their duties.... An alternate juror shall be
 discharged when the jury retires to consider its verdict or
 at such time as determined by the court.
 
 
 (Emphases added.)
 
 
          ¶106
 Crim. P. 24(e), in turn, provides, in pertinent part,
 "Alternate jurors in the order in which they are called
 shall replace jurors who become unable or disqualified to
 perform their duties.... An alternate juror shall
 not be discharged until the jury renders its verdict or
 until such time as determined by the court." (Emphasis
 added.)
 
 51
 
          ¶107
 As an initial matter, I note that a legitimate question
 exists as to whether these provisions conflict.
 
 
          ¶108
 Section 16-10-105 can reasonably be read to prohibit the
 mid-deliberation substitution of an alternate juror. As we
 acknowledged in Carrillo, 974 P.2d at 489, a plain
 reading of the language, "prior to the time the jury
 retires to consider its verdict," suggests that an
 alternate juror can replace sitting jurors only
 before the jury begins deliberations. Moreover, when
 read in light of that language, and presuming that the
 legislature did not intend to draft a facially
 self-contradictory statute, the statute's mandate that
 any alternate juror be "discharged when the jury retires
 to consider its verdict or at such time as determined by the
 court," § 16-10-105, arguably suggests that the
 court has discretion to discharge the alternate juror, but
 only before the jury begins deliberating, People
 v. Montoya, 942 P.2d 1287, 1295 (Colo.App. 1996).
 
 
          ¶109
 Crim. P. 24(e), in contrast, does not condition the
 substitution of an alternate juror on either a regular
 juror's inability to proceed or a disqualification
 occurring before the jury begins deliberations. Accordingly,
 the rule appears to permit mid-deliberation substitution in
 the trial court's discretion. Such a reading finds
 further support in the rule's additional mandate that an
 alternate juror is not to be discharged until the jury
 renders its verdict or until such other time as the court may
 determine. Crim. P. 24(e).
 
 52
 
          ¶110
 As we determined in Carrillo, 974 P.2d at 488,
 however, the matter of when an alternate juror may be
 substituted for a regular juror is a matter of substance, not
 procedure. Accordingly, the statute controls. Id.
 
 
          ¶111
 The question thus becomes whether the trial court erred under
 section 16-10-105 when it substituted Juror W in the middle
 of the jury's deliberations. Although this is an
 interesting question that we may need to address at some
 point, I need not decide it in this case because assuming
 without deciding that the substitution violated the statute,
 I believe that the application of the proper standard of
 reversal is dispositive here. I turn to that issue next.
 
 
          B.
 Applicable Standard of Reversal
 
 
          ¶112
 As noted above, the majority applies the presumption of
 prejudice standard from Carrillo, 974 P.2d at
 490-91, untethered from any determination, or even
 assumption, of error. Maj. op. ¶¶ 6-8, 40-41, 67,
 70, 83-84. For two reasons, I respectfully submit that this
 approach is mistaken.
 
 
          ¶113
 First, I do not believe that it is appropriate to apply a
 standard of reversal that is not tied to any determination of
 error. By definition, standards of reversal are applied only
 after an appellate court concludes (or at least assumes) that
 an error occurred. See, e.g., Pettigrew v.
 People, 2022 CO 2, ¶ 54, 501 P.3d 813, 825
 (assuming without deciding error before addressing
 harmlessness); Zoll v. People, 2018 CO 70, ¶22,
 425 P.3d 1120, 1127 (same); Crider v. People, 186
 P.3d 39, 41-42 (Colo. 2008)
 
 53
 
 (determining that the trial court had erred before
 considering whether the error was harmless). And unlike the
 majority, I do not believe that Carrillo intended to
 suggest otherwise. Specifically, although we perhaps could
 have been more clear in Carrillo, I read that case
 as implicitly assuming without deciding that an error had
 occurred. To the extent that Carrillo did otherwise,
 I respectfully submit that we erred in that regard.
 
 
          ¶114
 On this point, I am unpersuaded by the majority's
 expressed concern that reviewing for constitutional harmless
 error in this case could suggest that mid-deliberation
 substitution of a juror might be an error requiring a
 mistrial. Maj. op. ¶ 71 &n.14. If section 16-10-105
 so requires, then it is not for us to ignore that statutory
 command because we do not like the result. Rather, the matter
 becomes a policy issue for the legislature to address.
 
 
          ¶115
 Second, I believe that in James, we effectively
 overruled the presumption of prejudice standard that we had
 applied in Carrillo, adopting instead a structural
 error/harmless error dichotomy. In James, ¶ 2,
 426 P.3d at 337, we considered whether the district
 court's failure to recall an alternate juror for
 approximately ten minutes into the jury's deliberations
 was reversible error, and we ultimately concluded that any
 error was harmless. To reach this conclusion, we provided a
 detailed history of the standards of reversal that had
 applied in cases like the one there before us. Id.
 at ¶¶ 9-15, 426 P.3d at 337-40.
 
 54
 
          ¶116
 Specifically, we began by noting that in People v.
 Boulies, 690 P.2d 1253, 1255-56 (Colo. 1984),
 we had concluded that the presence of an alternate
 juror during jury deliberations raised a presumption of
 prejudice that, if unrebutted, required reversal.
 James, ¶ 10, 426 P.3d at 338. We then explained
 how we had subsequently applied that presumption of prejudice
 in People v. Burnette, 775 P.2d 583, 590 (Colo.
 1989), and Carrillo, 974 P.2d at 488, both of which
 involved scenarios in which an alternate juror was
 substituted for a regular juror after deliberations had
 begun. James, ¶¶ 11-12, 426 P.3d at
 338-39.
 
 
          ¶117
 We proceeded in James to observe, however, that
 although we had largely relied on federal authorities in
 deciding Boulies, federal law had changed since that
 time. Id. at ¶ 13, 426 P.3d at 339. In
 particular, we noted that in United States v. Olano,
 507 U.S. 725, 739, 741 (1993), which was decided after both
 Boulies and Burnette, the Supreme Court had
 considered the presence of an alternate juror in the jury
 room and concluded that an alternate juror's mere
 presence in the jury room should not be presumed to
 be prejudicial. James, ¶ 13, 426 P.3d at 339.
 Instead, in Olano, 507 U.S. at 739-41, the Supreme
 Court had described two ways in which the presence of
 alternate jurors during deliberations might be prejudicial
 and resolved the case by noting that the defendants had not
 objected to the participation of the alternates in the jury
 room and had not made a specific showing of prejudice.
 
 55
 
          ¶118
 Finally, we observed in James, ¶ 15, 426 P.3d
 at 339, that in the time since our above-described analyses
 of the presence or participation of alternate jurors in
 deliberations, the jurisprudence of both the Supreme Court
 and of our court concerning the nature and effect of trial
 errors had been substantially refined. In particular, we
 noted that in People v. Novotny, 2014 CO 18, ¶
 21, 320 P.3d 1194, 1201, we indicated that we had largely
 come to accept the structural error/trial error dichotomy
 that the Supreme Court had developed. James, ¶
 15, 426 P.3d at 339. Accordingly, we stated, with specific
 reference to our decision in Boulies, "that our
 reliance on federal case law for the proposition that an
 error of constitutional magnitude is committed by the mere
 presence of an alternate juror in the jury room during
 deliberations has turned out to have been mistaken."
 Id. at ¶ 16, 426 P.3d at 340. Instead, we
 stated that we are required to analyze an alternate
 juror's erroneous involvement in deliberations for
 prejudicial impact. Id. We then proceeded to address
 whether the alternate's presence in the jury room, though
 error, was harmless, and we concluded that it was.
 Id. at ¶¶ 19-21, 426 P.3d at 341.
 
 
          ¶119
 In my view, our foregoing analysis in James made
 abundantly clear that our prior presumption of prejudice
 standard had turned out to be incorrect and that the proper
 standard was to review under a structural error/trial error
 dichotomy, under which the former requires reversal but the
 latter does not, absent a showing of prejudice (i.e., that
 the error was not harmless). Indeed, I concurred in the
 
 56
 
 judgment in James, writing separately to express my
 view that the majority had adopted a false dichotomy because
 I believed that a third standard of reversal—a
 presumption of prejudice standard—existed and should
 have applied in that case, given that the error there defied
 harmless error review. Id. at ¶¶ 24-25,
 426 P.3d at 342 (Gabriel, J., concurring in the judgment).
 The majority, however, rejected this view, and, as a
 result, I perceive no basis for resurrecting the presumption
 of prejudice standard now, barring a decision to overrule
 James and follow my concurring opinion in that case.
 See also Johnson v. Schonlaw, 2018 CO 73, ¶ 11,
 426 P.3d 345, 348 (noting, in a case decided the same day as
 James, that in James, the court had
 rejected the notion that the erroneous participation of an
 alternate juror in deliberations could defy harmless error
 review).
 
 
          ¶120
 In so concluding, I am unpersuaded by the majority's view
 that James intentionally followed Olano and
 not Burnette and Carrillo because the
 factual circumstances in the respective cases were distinct.
 Maj. op. ¶¶ 56-62. For the reasons discussed above,
 the majority's analysis reads into James
 reasoning that simply is not there and, in my view, ignores
 much of what we actually said in James, as well as
 the import of our lengthy discussion in that case regarding
 the development of the law regarding standards of reversal.
 
 57
 
          ¶121
 Accordingly, consistent with James, I believe that
 we are required to apply a constitutional harmless error
 standard of reversal in this case, and I proceed to do so.
 
 
          C.
 Constitutional Harmless Error
 
 
          ¶122
 We review preserved trial errors of constitutional dimension
 under a constitutional harmless error standard. Hagos v.
 People, 2012 CO 63, ¶ 11, 288 P.3d 116, 119. This
 standard requires an appellate court to reverse unless it
 determines that the error was harmless beyond a reasonable
 doubt. Id. An error meets this standard when no
 reasonable possibility exists that the error might have
 contributed to the conviction. Id.
 
 
          ¶123
 The evidence on which the People may rely to establish
 constitutional harmless error depends on the facts of the
 individual case. See Crider, 186 P.3d at 43 (stating
 that "the likelihood of prejudice must be evaluated in
 the totality of the circumstances, on a case-by-case
 basis").
 
 
          ¶124
 For example, we have relied on the overwhelming nature of the
 evidence of guilt to conclude that an error of constitutional
 dimension was harmless. See, e.g., Bartley v.
 People, 817 P.2d 1029, 1034 (Colo. 1991) ("A
 constitutional error is harmless when the evidence properly
 received against a defendant is so overwhelming that the
 constitutional violation was harmless beyond a reasonable
 doubt."); see also Pettigrew, ¶¶
 56-59, 501 P.3d at 825-26 (concluding that a
 
 58
 
 constitutional error was harmless beyond a reasonable doubt
 because, among other things, the evidence against the
 defendant was overwhelming).
 
 
          ¶125
 In the present context, although I do not believe that the
 presumption of prejudice standard survived James, I
 would conclude that the factors that we set forth in
 Burnette, 775 P.2d at 590-91, for determining
 whether the presumption of prejudice has been overcome are
 likewise useful in assessing whether an error was harmless.
 
 
          ¶126
 Specifically, in Burnette, 775 P.2d at 590, we
 determined that the presumption of prejudice may be overcome
 "only by a showing that the trial court took
 extraordinary precautions to ensure that the defendant would
 not be prejudiced and that under the circumstances of the
 case, the precautions were adequate to achieve that
 result." Such precautions include (1) inquiring whether
 the regular jurors could disregard their prior deliberations
 and any opinions that they had formed on the questions
 presented; (2) inquiring whether the regular jurors could be
 receptive to the alternate juror's effort to assert a
 non-conforming view; (3) instructing the alternate juror not
 to discuss with others the alternate juror's view of the
 case and to refrain from forming an opinion based on
 information that the alternate might learn after being
 discharged; (4) upon the alternate juror's return to the
 courthouse to participate in deliberations, questioning them
 regarding their activities since being discharged and their
 
 59
 
 present ability to be fair; and (5) obtaining assurances from
 the remaining regular jurors and the alternate juror that the
 reconstituted jury's ability to render a fair verdict
 would not be impaired by the substitution. Id. at
 590-91. We also suggested that an appellate court could
 consider the time spent in the first round of deliberations,
 as compared with the second, to determine whether the jury
 had, in fact, followed the court's instructions.
 Id. at 590.
 
 
          ¶127
 In my view, these factors, among the other circumstances of a
 case, are instructive in determining whether any error in
 substituting an alternate juror in the middle of jury
 deliberations was harmless. I would thus apply those factors
 here, and doing so leads me to conclude that any error was
 harmless beyond a reasonable doubt.
 
 
          ¶128
 In this case, as noted above, the court meticulously took the
 precautionary measures that we had identified in
 Burnette. Specifically, the court instructed Juror W
 when it "recessed" her to continue to abide by all
 of the admonitions that the court had given during the trial,
 including the admonitions not to discuss the case with others
 and to avoid exposure to external information that could
 affect her opinion of the case. In addition, when the court
 recalled Juror W, it asked her whether she had followed its
 instructions, repeating each admonition individually, and she
 confirmed that she had done so.
 
 60
 
          ¶129
 The court also explained to the original eleven jurors that
 to be able to reconstitute the jury, they would need to be
 willing to start their deliberations anew. The court then
 gave those jurors time in the jury room to discuss whether
 they could do so, and they responded that they could. And the
 court took the extra step of confirming this with each juror
 individually.
 
 
          ¶130
 To ensure that the jurors would actually begin anew, the
 court further instructed the original jurors to destroy any
 notes concerning their initial deliberations and to select a
 new foreperson, and the court provided the reconstituted jury
 with blank verdict forms.
 
 
          ¶131
 Finally, I note that the reconstituted jury took five and
 one-half hours to reach a verdict, which, although admittedly
 not as lengthy a deliberation as the initial session, was
 sufficiently lengthy to suggest that the jury had, in fact,
 heeded the court's instructions.
 
 
          ¶132
 Given all of the foregoing, I would conclude that any error
 in allowing the mid-deliberation substitution of Juror W was
 harmless beyond a reasonable doubt. Indeed, to conclude
 otherwise, notwithstanding the trial court's
 extraordinary efforts to ensure a fair trial, would all but
 render the arguable error here structural. For the reasons
 set forth above, however, I do not believe that our current
 case law would support such a conclusion.
 
 61
 
          III.
 Conclusion
 
 
          ¶133
 For these reasons, I disagree with the majority's
 application of a presumption of prejudice standard,
 particularly without at least assuming that an error had
 occurred. Instead, I would assume without deciding that the
 mid-deliberation substitution was erroneous, and in
 accordance with James, ¶ 21, 426 P.3d at 341, I
 would review for harmless error. Doing so here, I would then
 conclude that any error was harmless beyond a reasonable
 doubt.
 
 
          ¶134
 Accordingly, I respectfully concur in the judgment, only.
 
 
 ---------
 
 
 Notes:
 
 
 [1] We granted certiorari to review the
 following issues:
 
 
 1. Whether the standard of review for a trial
 court's decision to substitute an alternate juror for a
 deliberating juror is de novo or abuse of discretion, or
 whether the standard of review is subsumed by the prejudice
 analysis.
 
 
 2. Whether the court of appeals erred by applying the
 presumption-of-prejudice test from People v.
 Burnette, 775 P.2d 583 (Colo. 1989), to the trial
 court's mid-deliberations substitution of the alternate
 juror instead of a harmlessness analysis as adopted by
 James v. People, 2018 CO 72[, 426 P.3d 336].
 
 
 [2] In this opinion, any reference to a
 defendant's right to a fair trial includes a
 defendant's right in a felony case to a fair and
 unanimous verdict by a jury of twelve without outside
 interference.
 
 
 [3] Just a few weeks ago, we explained
 that our prior opinion in Hagos v. People, 2012 CO
 63, ¶ 10, 288 P.3d 116, 119, recognized three standards
 of reversal for preserved nonstructural errors:
 constitutional harmless error, nonconstitutional harmless
 error, and a standard requiring that the effect of the error
 on the proceedings be constitutionally material to the claim
 advanced. People v. Crabtree, 2024 CO 40, ¶ 27,
 ___P.3d ___. The standard of reversal from Burnette
 and Carrillo we apply today is unique to
 mid-deliberations juror substitution. Thus, it is not
 surprising that it wasn't included in Hagos
 among the standards of reversal for preserved nonstructural
 errors.
 
 
 [4] Under Burnette and
 Carrillo, the precautions employed by a trial court
 to prevent prejudice to the defendant must be considered in
 light of the surrounding circumstances. For the sake of
 convenience and to avoid repetition, when discussing how the
 presumption of prejudice may be overcome, we don't always
 mention that the surrounding circumstances must be taken into
 account.
 
 
 [5] The People didn't specify whether
 the standard of reversal was constitutional or
 nonconstitutional harmless error. And James
 didn't have to resolve which type of harmless error
 standard applied in that case because the prosecution
 prevailed under either. ¶ 19, 426 P.3d at 341.
 
 
 [6] Interestingly, before us, the parties
 seem to have flipped sides. The People urge us to stand by
 the presumption-of-prejudice standard set out in
 Burnette and Carrillo, and Castro asks us
 to proclaim James and its outcome-determinative
 standard of reversal (constitutional harmless error)
 controlling.
 
 
 [7] In James, the error was
 preserved, so the outcome-determinative standard of reversal
 we applied was harmless error. ¶ 19, 426 P.3d at 341. In
 Olano, the error was unpreserved, so the
 outcome-determinative standard of reversal applied by the
 Supreme Court was plain error. 507 U.S. at 730, 741.
 
 
 [8] We use "statutory history"
 as a reference "to the evolution of a statute as it is
 amended over time by the legislature," which is
 different from "legislative history," a reference
 "to the development of a statute during the legislative
 process and prior to enactment or amendment."
 Carrera v. People, 2019 CO 83, ¶ 24 n.6, 449
 P.3d 725, 730 n.6 (quoting Colo. Oil & Gas
 Conservation Comm'n v. Martinez, 2019 CO 3, ¶
 30 n.2, 433 P.3d 22, 29 n.2).
 
 
 [9] Jurors (including alternates) are
 almost never sequestered now, and, in any event, it is not
 necessary to sequester alternate jurors to have them
 available to replace regular jurors during deliberations. As
 occurred here, many trial courts recess alternate jurors as
 deliberations are about to commence. The trick is to do as
 the trial court did here and provide alternate jurors
 appropriate admonishments regarding their conduct while
 deliberations are taking place.
 
 
 [10] It hardly bears stating that our
 General Assembly is free to clean up section 16-10-105. In
 the meantime, though, we remain in the dark about the
 legislative intent behind the statute, so we reaffirm that
 Carrillo continues to be good law.
 
 
 [11] When we decided Burnette,
 neither Crim. P. 24(e) nor section 16-10-105 permitted the
 replacement of a regular juror with an alternate juror during
 deliberations. Burnette, 775 P.2d at 586. Having
 acknowledged that the trial court had violated the rule and
 the statute through its mid-deliberations juror substitution,
 we proceeded to consider "the legal effect [on] the
 verdict of the improperly constituted jury."
 Id. at 587. It's in that context that we applied
 the presumption of prejudice from Boulies and
 discussed how that presumption may be rebutted.
 Id.
 
 
 [12] The holdout juror had reported
 during jury selection that he was hard of hearing but that
 his doctor had told him he didn't need hearing aids.
 Carrillo, 974 P.2d at 482.
 
 
 [13] Notably, the court of appeals in
 James had found the error harmless on a slightly
 different basis. ¶ 6, 426 P.3d at 337. That division had
 been persuaded by the trial court's questioning of each
 juror after the verdict was returned and the affirmation by
 each juror that the alternate had not influenced his or her
 verdict. Id. Although we acknowledged that CRE
 606(b) generally forbids inquiry into a jury's mental
 processes during deliberations, we stated that "it is
 not forbidden to inquire whether an outside
 influence was brought to bear upon any juror."
 Id. at ¶ 20, 426 P.3d at 341 (emphasis added).
 Still, we ultimately declined to address whether the trial
 court's questioning of the jurors was permissible under
 CRE 606(b) because we rested our harmlessness determination
 on other grounds. Id. at ¶ 21 n.1, 426 P.3d at
 341 n.1.
 
 
 [14] We considered the option of assuming
 without deciding that a mid-deliberations juror substitution
 is error, and then reviewing for constitutional harmless
 error. But if we're going to decline to decide if such a
 substitution is error, then why not take the error question
 out of the equation altogether and simply impose a rebuttable
 presumption of prejudice — a la Burnette and
 Carrillo? At any rate, we are obligated to cling to
 the presumption-of-prejudice approach shepherded by
 Burnette and Carrillo because we may not
 betray our old friend, stare decisis, "a basic
 self-governing principle within the Judicial Branch, which is
 entrusted with the sensitive and difficult task of fashioning
 and preserving a jurisprudential system that is not based
 upon 'an arbitrary discretion.'" Patterson
 v. McLean Credit Union, 491 U.S. 164, 172 (1989)
 (quoting The Federalist No. 78 (Alexander Hamilton)
 (Henry Lodge ed. 1888)), superseded on other
 grounds, Civil Rights Act of 1991, Pub. L. No. 102-106,
 105 Stat. 1071, as recognized in CBOCS W., Inc. v.
 Humphries, 553 U.S. 442 (2008).
 
 
 [15] Castro additionally argues that he
 was prejudiced by Juror C's participation because Juror C
 was a former judge and had legal expertise. Because this
 contention is beyond the scope of the questions we agreed to
 review, we do not address it.
 
 
 ---------